SCHWARTZ & PONTERIO, PLLC
134 West 29th Street – Suite 1006
New York, New York 10001-5304
Telephone: (212) 714-1200
Fax: (212) 714-1264
E-Mail: mschwartz@splaw.us

Matthew F. Schwartz (pro hac vice)

PAUL G. ULRICH, P.C. - 00424800
131 East El Caminito Drive
Phoenix, Arizona 85020-3503
Telephone: (602) 248-9465
Fax: (602) 248-0165
E-Mail: ulrichpc@aol.com

Paul G. Ulrich – No. 001838
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| RENEE CECALA, | ) | |
| | ) | |
| Plaintiff, | ) | Dkt. No. CV 04-2612 PHX NVW |
| | ) | |
| vs. | ) | **SECOND AMENDED COMPLAINT** |
| | ) | |
| DAVID B. NEWMAN and | ) | |
| COOPERMAN LEVITT WINIKOFF | ) | |
| LESTER & NEWMAN, P.C., | ) | |
| | ) | |
| Defendants. | ) | |

**Jurisdiction and Venue**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §
1332(a)(1) in that plaintiff is a citizen of Arizona and defendants are citizens of New
York and the amount in controversy exceeds $75,000.

-1-

2.      Venue in this judicial district is appropriate pursuant to 28 U.S.C. §§ 1391(a)(1) and 1391(a)(2).

### Demand for Jury Trial

3.      Plaintiff demands trial by jury of all issues triable by jury in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

### Parties

4.      Plaintiff Renee Cecala is a resident and citizen of the State of Arizona.

5.      Upon information and belief defendant David B. Newman ("Newman") is, and at all times relevant to this action was, a citizen of the State of New York.

6.      At all times relevant to this action, defendant Newman was an attorney admitted to practice in the State of New York.

7.      At all times relevant to this lawsuit, defendant Cooperman Levitt Winikoff Lester & Newman, P.C. ("Cooperman-Levitt") was a professional corporation organized and existing under the laws of the State of New York and engaged in the practice of law with an office located at 800 Third Avenue, New York, New York.

8.      At all times relevant to this action, defendant Newman was a partner and/or shareholder in Cooperman-Levitt.

### Plaintiff's Employment at NationsBank

9.      From June 27, 1994 through April 2, 1997, plaintiff was employed by one or more entities of NationsBank Corporation, the $350 billion predecessor renamed, and presently known as, Bank of America Corporation (hereafter "NationsBank").

10.     At the age of twenty-nine, plaintiff was recruited and relocated by NationsBank from New York City, where she was working for Citicorp (then the country's largest banking corporation), to serve as a vice president in an investment-banking unit located in Charlotte, North Carolina.

11.     Although not a college graduate, plaintiff had worked successfully in many facets of the financial services industry since the age of eighteen, including in commercial real estate appraisal, secondary mortgage markets, and mortgage securitization.

12.     Plaintiff had been successful in her career.  She had never been discharged or laid off from a job.  She had not sued, threatened to sue, been sued, or otherwise contemplated or participated in litigation with any prior employer.  Plaintiff had never received diversity or sexual harassment training, and was not informed of or educated in labor or employment law.

13.     During the term of plaintiff's employment with NationsBank she received outstanding performance reviews, and on a regular basis was assigned substantial responsibilities in addition to those for which she had originally been hired.  However, plaintiff was also subjected over time to misconduct giving rise to claims for, among other things, misrepresentation, and unlawful sex discrimination.

14.     Some of plaintiff's employment-related experiences were shocking by any reasonable standard.  For example, one day early in Plaintiffs employment with NationsBank, she was discussing business issues with colleagues on the "trading floor," where about one hundred and fifty people, mostly males, worked in the high-stakes bond trading businesses of the broker-dealer entity. The chairman of NationsBank, Hugh L.

-3-

McColl, Jr., appeared on the trading floor, which he regularly visited.  Shortly thereafter, a male stripper dressed as a Dominos Pizza delivery person walked across the trading floor, and in front of a female trader, began undressing and gyrating in sync with recorded music from a tape player. The chairman stood watching the events unfold, laughed and smiled as the woman shrieked with embarrassment, and did nothing to stop the stripper or the work standstill that had ensued.

15.    One married vice-chairman caused the bank to be threatened with a lawsuit because of his sexual affair with his assistant, who was married to someone else. The assistant's husband was very vocal in the community about his outrage, and divorce ensued. The assistant was promoted to vice president.

16.    One woman vice president went to the human resources department to inquire about the NationsBank maternity leave policy, noting that the policy was inferior to that of other large financial institutions. Consequently, she was called into the office of a vice-chairman and informed that if she wanted to continue working at NationsBank, she had better not mention the maternity leave policy again. She was ultimately forced out of the company and was blacklisted.

17.    Other offensive conduct took place throughout plaintiff's tenure at the banking company.  For example, two managing directors, one senior vice president, and two vice presidents, made overt, unsolicited, and unwelcome sexual advances toward plaintiff.  Three of those individuals were plaintiff's supervisors.

18.    One of those managing directors, a 270-pound man who was personal friends with the bank president and at least two vice-chairmen of the banking corporation,

forcibly kissed, restrained, and groped plaintiff on multiple occasions, against her repeated requests that he not do so.

19. The language and gestures used regularly in plaintiff's working environment included a wide variety of vulgarities and clearly and unmistakably demeaning comments about women, to women, and in front of women. For example, the male traders referred to each other as "douche bags," "pussies," "motherfuckers," and "women," often shouting such labels across the trading room.

20. One managing director repeatedly used the expression "what an abortion that was" when referring to a financial transaction that had failed. Plaintiff's supervisor repeatedly referred to the management structure as a "circle jerk." Sexual innuendo and "dirty" jokes were rampant in the environment.

21. In addition, attendance at social events and other client outings was important to the success and career advancement of professionals at NationsBank. It provided them with the opportunity to develop important personal and professional relationships with clients and with senior management . Plaintiff and other women at NationsBank were repeatedly excluded from attending these events, many of which were held at strip clubs and topless bars and were paid for by NationsBank.

22. Based on the treatment she received and the hostile working environment for women at NationsBank, plaintiff had viable and meritorious claims for sex discrimination, sexual harassment, and other claims against her employer under Title VII and applicable federal and state law.

**Retainer of the Defendant Attorneys**

23.     Around January 1997, plaintiff retained defendants Newman and Cooperman-Levitt to advise and represent her in connection with any claims she might have against NationsBank.  The defendants agreed to represent plaintiff in these matters.

24.     Plaintiff had an attorney-client relationship with each of the defendants named herein and each of the defendants owed plaintiff a non-delegable duty.

**Mishandling Pre-Litigation Matters**

25.     Defendant Newman enlisted attorney Kenneth J. Rubinstein ("Rubinstein"), then an associate employed by Cooperman-Levitt, to work with him on plaintiff's matters.  Throughout the representation, defendant Newman was the attorney at Cooperman-Levitt who had primary responsibility for plaintiff's representation and supervisory responsibility for all attorneys at Cooperman-Levitt, including Rubinstein, who were working on plaintiff's matter.

26.     Defendant Newman did not have the legal knowledge, training, and experience in employment discrimination matters to exercise competent judgment on plaintiff's behalf with respect to her employment issues, and did not affiliate with lawyers who did.

27.     Further, neither defendant Newman nor any attorney who handled plaintiff's matter was admitted to practice law in North Carolina or Arizona.  Defendant Newman and his associates at Cooperman-Levitt did not know, consider, or investigate North Carolina or Arizona employment law, regulations, or practice, or federal

employment law of the 4th Circuit, and therefore could not and did not reasonably advise plaintiff or protect her interests.

28.     Defendants Newman and Cooperman-Levitt failed to conduct an adequate investigation into the facts giving rise to plaintiff's claims against NationsBank and Newman failed to investigate NationsBank's employment policies.

29.     Defendant Newman did not know or learn plaintiff's legal rights and did not appropriately evaluate plaintiff's employment concerns.  As a result, Newman's judgment, advice, and actions were imprudent, inadequate, and objectively harmful.

30.     Defendant Newman did not fairly and fully explain the employment litigation process to plaintiff so that she could make an informed decision about proceeding with litigation, and make an informed decision about proceeding with Newman and Cooperman Levitt as her counsel.

31.     Newman formulated and executed a plan of action without adequately consulting with plaintiff.  The plan formulated by Newman was below the standard of care and inconsistent with plaintiff's objectives and best interests.

32.     For example, defendant Newman moved immediately to inform NationsBank that plaintiff was represented by counsel, rather than first attempt resolution by discreetly guiding plaintiff through a complaint process from behind the scenes. Moreover, Newman did not discuss with plaintiff the consequences likely to flow from such a disclosure to her employer.

33.     Newman wrote a letter on February 20, 1997 and sent it to numerous senior executives of NationsBank, including the Real Estate Group Executive, Capital Markets group president, and plaintiff's supervisors.

34.     Newman's initial letter to NationsBank was highly confrontational, and was simultaneously sent to multiple senior NationsBank executives, including plaintiff's direct supervisors.  Newman did not consult with plaintiff prior to sending the initial letter.

35.     The reaction to Newman's letter as experienced by plaintiff was immediate, adverse, hostile, and retaliatory.  Plaintiff was stunned and totally unprepared by Newman for the ensuing furor.

36.     Newman subsequently dictated by telephone the contents of a written complaint for plaintiff to submit to NationsBank as a step toward resolving her employment issues.  She typed the complaint as formulated by Newman, and thereafter presented a copy of the document for consideration by the newly appointed Real Estate Group Executive.  The cumulative effect was devastating to the terms and conditions of plaintiff's employment, her standing, and to her emotional state.  Unnecessary, avoidable, and adverse employment standing and legal consequences resulted from the content of the written complaint.

37.     Newman, without consultation with plaintiff, and without her knowledge or understanding, presented sexual harassment in the form of hostile work environment as one of plaintiff's grievances.  Plaintiff had no knowledge of what a hostile work environment sexual harassment claim was, and, at that time, had no intention at any time

of making a complaint for sexual harassment, whether or not she could reasonably do so under the facts of her employment.

38.     Having made such a claim, defendant Newman failed to present the complete facts and circumstances that would have supported and proved such a claim and failed to advise plaintiff of the potential risks and consequences of such a course of action.  For example, Newman did not explain to plaintiff why he advised her to include certain content, and what the content meant in relation to Title VII or other employment law.  Nor did he explain what the law requires to form a basis of unlawful disparate treatment with respect to pay and promotion practices.

39.     Newman did not know, investigate, or inform plaintiff about what she should reasonably expect under applicable legal and regulatory authorities related to NationsBank's investigation of her equal employment opportunity-type complaints.  Therefore, plaintiff was inadequately prepared to participate in the complaint investigation process, did not pursue all internal avenues of redress of her grievance with her employer, and did not benefit from NationsBank's official EEO policies and procedures.

40.     In addition, Newman did not monitor and evaluate the complaint investigation process, assess NationsBank's compliance with its own policies, or undertake to determine if the investigation and complaint resolution process comported with North Carolina or federal employment law and regulations.  For those reasons, yet another opportunity to protect plaintiff's interests, rights, and privileges, to avoid harm, and to achieve a favorable outcome was squandered.

41.     Newman failed to anticipate and prepare plaintiff for possible retaliation and other unlawful discrimination.  As an example, plaintiff was given no legal education about what constituted unlawful retaliation, how to record any if it happened, and how to respond to it.

42.     NationsBank retaliated against plaintiff by, among other things, removing her assignments, refusing to communicate with plaintiff, and humiliating plaintiff in front of dozens of other employees and executives.

43.     Plaintiff was constructively discharged from her job by NationsBank in March 1997, primarily in retaliation for complaints made through and under the direction of Newman.  Plaintiff's employment at NationsBank formally ended April 2, 1997.

44.     Newman did not reasonably assist plaintiff to avoid the loss of her employment by investigating or suggesting alternatives.  For example, Newman made no mention of the option of filing a North Carolina administrative employment discrimination complaint or contacting the EEOC.  Newman did not suggest that plaintiff seek a leave of absence for a "cooling off" period, or in which to seek another position within the company.  Newman did not counsel plaintiff to take her outstanding issues up the chain of command, when plaintiff had not met with Human Resources executives or spoken to her (plaintiff's) designated EEO officer.

45.     Newman took no prudent and reasonable steps to mitigate the harm of employment resignation.  Newman did not discuss with plaintiff the potential adverse impact of employment termination with respect to her employee benefit plans, stock

option issues, and the like, or warn plaintiff about potential blacklisting, which any reasonably prudent and competent lawyer would have done.

46.     Newman did not consider or recommend to plaintiff that she negotiate an understanding and documentation with NationsBank related to future employment references, he did not think to do it on her behalf, and therefore none was obtained.

47.     When plaintiff first consulted with David Newman, in January and February 1997, plaintiff was in no danger whatsoever of losing her employment with NationsBank.  She had just received an annual review reflecting that her performance "consistently and greatly exceeds expectations," she was considered by her supervisors to be an essential part of the coming year's business plan, had been approved for a $10,000 salary increase, and had been granted a $60,000 bonus.

48.     The negligence by Newman and Cooperman Levitt caused unnecessary, avoidable, and irreparable harm to plaintiff's employment relationship, harmed her immediate and future prospects for addressing her employment concerns, caused or contributed to plaintiff's related job loss, and caused plaintiff to experience added emotional distress, among other things.

49.     Thereafter, plaintiff had difficulty finding suitable new employment. Plaintiff had several promising employment prospects but was not offered employment, upon information and belief, because NationsBank "blacklisted" plaintiff by giving poor references when requested by plaintiff's potential employers.  Newman failed to know and inform plaintiff that there were legal  protections related to post-employment retaliatory misconduct.

50.     When plaintiff informed Newman that she was experiencing difficulties finding new employment, that she was experiencing negative job references, and that she was being falsely represented to have sued NationsBank, Newman provided no substantive advice and did not investigate or take any steps on plaintiff's behalf to mitigate the retaliation by NationsBank.

51.     In June, 1997, plaintiff, having emotional difficulties and difficulties securing new employment, was low on funds and was forced to terminate her residency in North Carolina.  Plaintiff thereafter became a citizen and resident of Arizona.

52.     Around late July, 1997, Newman agreed to represent plaintiff in litigation against NationsBank.  Plaintiff was relocating to Arizona, but Newman chose not to withdraw from representing plaintiff, or to refer plaintiff to an Arizona or North Carolina law firm.

## Commencement of the Employment Arbitration

53.     In September, 1997 the defendants commenced an arbitration proceeding against NationsBank on plaintiff's behalf by filing a "Statement of Claim" and "Uniform Submission Agreement" with (generally) the National Association of Securities Dealers, Inc. (the "NASD").

54.     The claims asserted in the Statement of Claim were viable and meritorious and plaintiff would have prevailed on these claims had the defendant attorneys represented her properly.  In addition, the defendant attorneys failed to assert certain other claims in the Statement of Claim that would have been meritorious.

-12-

55.     Moreover, defendant Newman and his associate Rubinstein made legal decisions in the early stages of the litigation concerning which claims to assert and the forum in which to present them that prejudiced plaintiff's claims and other important rights and privileges, all without adequately consulting with plaintiff.

### Mishandling of Discovery

56.     Once the arbitration was commenced, defendant Newman did not competently pursue discovery in plaintiff's case.  Because of their inexperience in employment discrimination litigation, Newman and Rubinstein did not know what documents and information were ordinarily and customarily sought, and why. Consequently, the lawyers did not formulate and execute a reasonably adequate discovery plan.

57.     For example, the defendants failed to discover NationsBank's affirmative action plan and related compliance review information; failed to obtain NationsBank internal policy guides and manuals for managers on identifying and reporting sexual harassment; human resource department manuals; prior complaints of employment discrimination; or electronically stored documents and information.  In addition, they did not seek and obtain statistical information from NationsBank related to compensation, promotion, title, job classification, gender, and the like that is routinely sought by plaintiffs in such cases.

58.     The defendants did not obtain sufficient documentation from NationsBank concerning the performance evaluations.  NationsBank produced the performance evaluations of only one comparator of several and such production occurred nine months

after the hearings commenced.  Despite the lack of discovery, the defendants did not

move to compel production of comparator performance evaluations through the NASD or

through a court even after NationsBank was proved by one of its employees (Mr. Sherrill)

to have lied to plaintiff and the panel about the availability of performance evaluations.

59.     Further, the defendants did not consider obtaining the personnel files for

each of the individuals hired or transferred to replace plaintiff after she had been

constructively demoted and constructively discharged.

60.     The defendants failed to adequately maintain and monitor the information

they did receive during discovery.  For example, NationsBank personnel files that were

obtained contained a variety of codes but Newman failed to request from NationsBank

the code keys so that he could decipher the information.  Among the codes he ignored

was *prima facie* evidence of retaliation against plaintiff, and information favorable to a

comparable worth doctrine analysis and plaintiff's allegations in the case.

61.     In addition to other discovery failures, Newman and Rubinstein failed to

simply track and ensure the receipt of what they requested in the first place.  For example,

compensation data on plaintiff's comparators was not received until eight months after

plaintiff's testimony had been taken as to her alleged damages.  No financial performance

data was produced until after the start of the hearing.  Other documents and information

were never produced, including a key comparator's complete employment file and

NationsBank's privilege logs.

62.     In addition, plaintiff had in her possession in Arizona hundreds of

documents from her employment with NationsBank, yet Newman and Rubinstein did not

request to review them.  When plaintiff asked Newman in October 1998 why he was not concerned about formulating documentary exhibits or visuals, he told plaintiff that in his experience it was "better to give the arbitrators as few pieces of paper as possible."

**Mishandling the Arbitration Hearings**

63.     Arbitration hearings commenced at a Hilton Hotel in Charlotte, North Carolina on Thursday, August 6, 1998.  Arbitration hearings continued intermittently (October 1998; November 1998; May 1999; June 1999) until the final hearing dates of October 19-20, 1999.

64.     Because of Newman's lack of a coherent trial strategy, he failed to offer certain evidence on the case in chief and instead, opted to wait for "rebuttal."  For example, defendant Newman either did not know, as lawyers representing clients in securities industry arbitration should know, that rebuttal is not a right in the hearing process and can be refused or curtailed, or he withheld that material fact from his client. Because what should have been done on the main case or not undertaken at all was put in on the rebuttal, plaintiff's case was diminished considerably.

65.     Defendant Newman failed to submit a competent analysis of the damages suffered by plaintiff.  The damages chart prepared and submitted by defendant Newman, compared to what plaintiff was entitled to seek in fact and in law, was comprehensively deficient and inaccurate.  Although defendant Newman possessed specific financial information related to plaintiff's "comparators" from discovery, his damages chart bore no correlation whatsoever.  Ultimately defendant Newman offered inadequate proof of

damages at the time he took plaintiff's testimony on damages, and was precluded from trying to make up for it on his rebuttal case.

### Newman's Sexual Misconduct

66.    Defendant Newman further compounded his negligence by engaging in an improper sexual relationship with plaintiff.  From the termination of her employment at NationsBank, plaintiff entered a downward spiral.  Because of the actions of NationsBank, plaintiff struggled with debilitating depression.

67.    Defendant Newman knew that plaintiff was experiencing feelings of anxiety and insecurity and that she had become emotionally dependent upon defendant Newman.  Newman misused plaintiff's confidential information, which he had obtained exclusively as a result of his fiduciary relationship with Plaintiff.  He knew, for example, that during this period plaintiff was unemployed and emotionally distraught.

68.    Newman also knew that plaintiff had experienced traumatic loss in the course of her life as a result of her divorce, near-death experiences of loved ones, suicide of a close relative, and other things.  Newman knew that Plaintiff had unexpectedly lost her employment with NationsBank, was unemployed, and had depleted all of her assets.

69.    Defendant Newman knew, or reasonably should have known of these developments affecting his client.  These circumstances of difficulty finding work because of blacklisting and depression caused by NationsBank, and gossip meant that plaintiff's claims against NationsBank were all the more important since they represented plaintiff's only real hope of winning back her reputation for future employment.  Under these circumstances, plaintiff was vulnerable to defendant Newman's predations.

70.    Defendant Newman used his position as the plaintiff's attorney, his superior knowledge position of trust and power over plaintiff's fundamental interests, his knowledge of her dependence upon him, and her vulnerable position to gain sexual favors, thus breaching his fiduciary duty.  Defendant Newman took advantage of information obtained in his representation of plaintiff, plaintiff's vulnerable position, and his position of trust as her attorney to entice and seduce plaintiff into a sexual relationship that she otherwise would not have engaged, beginning in August, 1998.

71.    The night before plaintiff's first arbitration hearing, in early August, 1998, Newman, in lieu of preparing for the hearing, sought Plaintiff's company in the hotel hot tub; the same hotel where both the employer's attorney and the arbitrators were staying. Plaintiff did not comply, but was forced to wait in Newman's hotel room while he sat in the hot tub hoping, he later admitted, she would join him.

72.    Defendant Newman left a flirtatious voicemail for Plaintiff on her cell phone on Friday night or Saturday after the hearings, and then the following Tuesday told Plaintiff that he had called the airlines about flights to Phoenix.  He told her he was thinking of coming to Phoenix, to work on the case and visit her.

73.    After further conversation, Newman said to Plaintiff, "It's your job to work out the travel details, and it's my job to win this case for you."  As of August 16, 1998 Newman dreamed up a nickname for Plaintiff, Bright Eyes.  He flew to Phoenix the following Sunday and began the sexual relationship with plaintiff during this visit to Phoenix.

74.     Toward the end of August, 1998, Newman attempted to coerce Plaintiff into flying to London to meet him, after his wife and children had departed the apartment where he was staying.  He was not about to pay for Plaintiff's airline ticket to London and told her "unfortunately, the discount on your bill does not convert to cash.  Maybe you can factor it."

75.     Plaintiff did not fly to London.  Newman was very angry, and was emotionally abusive to plaintiff over the course of several days with respect to her failure to purchase an airline ticket.  Newman told her, among other things, that he needed to "quit thinking with (his) dick."

76.     Newman also knew that plaintiff was forced to sell personal belongings and was unable to work regularly, if at all, at a point in early 1999.  Newman knew that plaintiff was unable to support herself, and from time to time was forced to reside with family members when she could not, for reasons of emotional illness, properly care for herself.  Despite this, defendant Newman focused more of his energy and attention on the sexual relationship than he did to providing competent representation.

77.     Plaintiff tolerated and succumbed to defendant Newman's inappropriate sexual advances to her because she was afraid that refusing or rejecting defendant Newman's advances toward her would cause defendant Newman to stop representing her, to lose her case, or to otherwise jeopardize her legal rights.  After the sexual relationship began, plaintiff was led to believe that  defendant Newman's continued representation was conditioned upon plaintiff's continued participation in the illicit sexual relationship initiated by defendant Newman.

78.     For example, Newman conditioned work on plaintiff's arbitration upon her good behavior and upon his travels to Arizona and Utah to see her.  He traveled to Arizona approximately six times, and to Utah/Nevada once, to work on Plaintiff's case and to obtain personal companionship and sexual relations.  Newman used work on the case as the enticement to ensure her consent and led her to believe that, among other things, by traveling to Arizona he would have more time to focus on her case.

79.     Newman traveled to Utah for about five days in May 1999.  Although he represented to plaintiff that if her family would pay for his expenses he would travel to Utah to prepare for the May hearings, Newman had little interest in doing anything to prepare for hearings.  He did seek plaintiff's company to go to the movies and sexual relations in his hotel room, and he availed himself of the family swimming deck and chatted with plaintiff's parents about his children and personal interests.  He was resentful that even though he delegated tasks for hearing preparation to plaintiff he should have been attending to, plaintiff was too anxious and overwhelmed to socialize.

80.     Newman attempted to coerce and did coerce Plaintiff into paying for some of his meals, entertainment, and travel to access her.  In February, 1999 Newman attempted to coerce Plaintiff into purchasing clothing and lingerie to suit his particular tastes.

81.     When Plaintiff tried from time to time to end the sexual and romantic aspect to the attorney-client relationship, for example in April 1999, Newman reacted with emotional outbursts of anger and resentment that intimidated Plaintiff, and crude comments that she found offensive.  He also sent her emotional emails.

-19-

82.    At around the same time, Newman pressured Plaintiff to have intercourse with him even though she informed him that she was experiencing severe pain and discomfort from a urinary tract infection and could not have sex.  Newman continued to pressure her for sex until she acquiesced.

83.    Newman  also invoked the "silent treatment" including avoiding talking to plaintiff about her pending litigation.  Even when Newman would be available to discuss the legal matter, he would be rude, brusque, or cold to manipulate plaintiff's emotions.

84.    Defendant Newman affirmatively misled plaintiff despite his duty of candor by rejecting Plaintiff's expressions of guilt, shame, worry, and remorse related to the sexualized attorney-client relationship by telling her that there was "nothing wrong with it," "it wasn't hurting anybody," and that they were "entitled to privacy."

85.    During this period, in plaintiff's Arizona residence, Newman would frequently caress Plaintiff's body when he thought she was asleep, and when she wanted to go to sleep.  On one night in early 1999 Plaintiff confronted Newman and tried to explain how demeaned that it made her feel that he would touch her when she did not want to be touched, and that she needed to be able to sleep or her depression symptoms worsened.  Newman became insulted and angry and went to sleep in another room.

86.    Despite the obvious negative effects of the sexual relationship, defendant Newman continued to press sexual demands.  Throughout the Charlotte hearing dates, time that Newman should have spent preparing for hearings was spent on his preoccupation with his emotional and sexual involvement with his client.  He sought and required plaintiff's company virtually every night that he was in Charlotte.

87.     Often times Newman kept plaintiff up so late that she had little or no sleep throughout the hearings, which was a particular hardship because of the nature of her physical and mental health problems.  This also had a negative effect on plaintiff's presentation as a witness.

**Constructive Abandonment**

88.     In June, 1999, after five sets of hearing dates, and approximately 16 hearing days in Charlotte, plaintiff's arbitration counsel, defendants Newman and Cooperman-Levitt constructively abandoned and withdrew from their representation of plaintiff.

89.     Defendant Newman's misconduct culminated in plaintiff's second emotional breakdown.   She could no longer withstand Newman's misconduct, and the psychological pain and suffering that he was inflicting upon her and the lives of her friends and family.  Therefore, and for self-preservation, plaintiff believed she had no other choice but to write a letter to Newman, and Cooperman-Levitt, terminating their legal representation.

90.     Defendant Newman provided no counsel to plaintiff with respect to the potential negative effects of termination at that point in the proceedings.

91.     Following the termination of the legal representation, defendants Newman and Cooperman-Levitt refused to return plaintiff's remaining files from their possession to her and improperly asserted a lien against her claims, thereby further prejudicing plaintiff in her claims against NationsBank.

92.     Plaintiff was unable to obtain replacement arbitration counsel.  Plaintiff was ordered by the arbitrators to appear pro se at the final hearing dates in October 1999,

-21-

or forfeit her two remaining arbitration dates.  Although incompetent to represent herself, and without having been given the entirety of her legal files and related materials from the defendants, plaintiff appeared for the final hearing dates, October 19 and 20, 1999.

93.     On December 15, 1999, NationsBank submitted a 75-page post hearing brief to the panel of arbitrators.  By then, plaintiff was incapacitated, living under her family's care, suffering from debilitating effects of major depression and post-traumatic stress disorder, unable to work, insolvent, without arbitration counsel, and, after a two-plus year long arbitration with over 4,000 pages of transcripts, unable to submit a post-hearing brief.

94.     On February 15, 2000, plaintiff received an adverse arbitration award, which award ordered plaintiff to pay to the NASD fifty (50) percent of the total arbitration forum fees assessed in the matter, or approximately $23,150.00.

**Post-Arbitration Proceedings**

95.     On May 10, 2000, plaintiff moved to vacate the arbitration award in the United States District Court for the Western District of North Carolina under Docket No. CV3:00-MC-0039.

96.     On April 4, 2001, plaintiff's motion to vacate was denied and the NASD arbitration award was confirmed.

97.     On May 4, 2001, plaintiff filed a notice of appeal in the District Court.

98.     On July 12, 2002, U.S. Court of Appeals for the Fourth Circuit affirmed the order of  District Court.

-22-

99.    Plaintiff moved for a re-hearing but, on August 23, 2002, the Fourth Circuit denied plaintiff's motion for re-hearing *en-banc*.

100.    On November 21, 2002, plaintiff's time to file a petition for certiorari with the U.S. Supreme Court expired.

101.    As a result of the foregoing, plaintiff's claims against NationsBank were dismissed and plaintiff is forever barred from recovering damages and obtaining remedies based on her claims against NationsBank.

**FIRST CAUSE OF ACTION**
Legal Malpractice

102.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-101 of this Second Amended Complaint as though fully set forth herein.

103.    Defendants Newman and Cooperman-Levitt acted as plaintiff's attorney from the time they were retained in January, 1997 on a continuous basis thereafter through and including June 21, 1999.

104.    As attorneys for plaintiff, the defendants Newman and Cooperman-Levitt each owed plaintiff a duty of undivided loyalty and a duty to render legal services in a competent and professional manner and to act with ordinary and reasonable skill, care, and diligence.

105.    As a result of the attorney-client relationship created by the above conduct of the parties, defendant Newman, who held himself out to plaintiff as possessing greater than ordinary knowledge and skill in the field of employment law, had a duty to represent

-23-

plaintiff with the reasonable care, skill, and diligence ordinarily possessed and exercised by attorneys specializing in the field of employment law under similar circumstances.

106.   Defendants Newman, Cooperman-Levitt, and their agents, employees, partners, and associates acted negligently under the circumstances, failed to provide adequate legal services to plaintiff in accordance with generally accepted standards of the legal profession, and failed to act with ordinary and reasonable care, skill, and diligence.

107.   The negligence of defendants consisted of, among other things, failing to perform an investigation regarding the circumstances giving rise to plaintiff's claims; failing to review the evidence; failing to disclose and explain to the plaintiff the possible risks and benefits of different courses of action; failing to advise plaintiff of the alternatives to litigation; failing to interview witnesses; failing to represent plaintiff's interests competently in negotiating a pre-litigation resolution; failing to advise plaintiff in the pre-litigation stage of the possible courses of action and their potential risks and consequences; failing to adopt a coherent strategy for resolving plaintiff's claims; failing to seek administrative remedies; failing to assess and assert all potential claims within the applicable limitations period; failing to assert the correct claims in the employment arbitration; failing to assert the proper theories of liability in the employment arbitration; failing to conduct adequate discovery in the employment arbitration; failing to make pre-trial motions; failing to develop evidence in support of plaintiff's claims; failing to consult with expert witnesses; failing to submit evidence; failing to prepare for arbitration; failing to introduce evidence at arbitration; failing to call witnesses at arbitration; failing to prepare plaintiff for her direct testimony and cross-examination;

failing to call expert witnesses at arbitration; failing to conduct adequate cross-examination of opposing witnesses; failing to make adequate legal arguments at arbitration; failing to make necessary objections; failing to research and/or know the applicable law; failing to make proper motions; failing to file an appeal; and failing to advise plaintiff properly.

108.   In addition to the foregoing, defendant Newman committed malpractice by sexualizing the attorney-client relationship in August, 1998.  Throughout the arbitration proceeding, defendant Newman was more focused on pursuing a sexual relationship with plaintiff than on providing effective legal representation.  This conduct impaired defendant Newman's judgment and plaintiff's ability to testify on her own behalf and to assist in the presentation of her case.

109.   In addition, plaintiff has been prejudiced by the passage of time, in that the facts and circumstances surrounding the claims against NationsBank have been obscured and that that defendants' negligence placed the plaintiff in a position where she may not be able to fully explore and prove the facts to establish the liability of NationsBank on the underlying claims because of the spoliation of evidence and loss of witnesses.

110.   Defendant Newman further committed legal malpractice by practicing law without a license in Arizona and North Carolina and by violating the applicable attorney disciplinary rules in Arizona, North Carolina, and New York, including such rules that prohibit, among other things:

a.   Improperly accepting employment;

b.   Failing to act competently;

c.       Failing to withdraw to avoid a conflict of interest;

d.       Engaging in conduct involving dishonesty;

e.       Failing to provide zealous representation;

f.       Failing to disclose conflicts and potential conflicts;

g.       Engaging in sexual relations with a client;

h.       Engaging in unauthorized practice of law; and

i.       Charging illegal fees.

111.    Plaintiff would have prevailed on her claims against NationsBank and would have recovered substantial money damages and other remedies but for the defendants' malpractice as described above.  In the alternative, had the defendants advised plaintiff properly before she began the arbitration against NationsBank, she would have decided not to pursue the claims, continued in her career with her good reputation intact, and would have continued to receive salary and benefits commensurate with her abilities  and qualifications.

112.    In regard to his actions alleged above, defendant Newman acted willfully, wantonly, maliciously, recklessly, and with such wanton dishonesty as to imply criminal indifference to civil obligations.  Defendant Newman's conduct was aggravated and outrageous and constituted conscious action of a reprehensible character.  Defendant Newman acted with intent to injure plaintiff, with deliberate intent to interfere with the rights of plaintiff, and consciously disregarded the unjustifiably substantial risk of significant harm to plaintiff, warranting the imposition of punitive damages.

113.    Defendant David B. Newman is directly responsible and liable for all of the foregoing by virtue of his personal conduct and his role as supervisory attorney responsible for plaintiff's case.

114.    At all times relevant to this lawsuit, defendant Newman was employed by and acting within the scope of his employment with defendant Cooperman-Levitt.

115.    Defendant Cooperman Levitt Winikoff Lester & Newman, P.C. is vicariously liable for the legal malpractice of defendant Newman and the other attorneys who handled her case against NationsBank.

116.    Defendant Cooperman Levitt Winikoff Lester & Newman, P.C. was aware, or reasonably should have been aware of all the foregoing, and is also therefore directly liable for the acts of defendant Newman by reason of its failure to supervise defendant Newman and the other attorneys responsible for plaintiff's representation and because of its ratification of the conduct of defendant Newman.

117.    By reason of the foregoing, plaintiff has been damaged, and continues to be damaged, because of the legal malpractice of defendants and is entitled to actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court.

## SECOND CAUSE OF ACTION
Breach of Fiduciary Duty

118.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-117 of this Second Amended Complaint as though fully set forth herein.

119.    A fiduciary relationship arose between plaintiff and each of the defendants and there was an unequal relationship between the parties wherein the plaintiff placed trust and confidence in the defendants to act on her behalf and provide her with advice.

120.    As attorneys for plaintiff, the defendants Newman and Cooperman-Levitt each owed plaintiff a fiduciary duty of loyalty, confidentiality, and disclosure that included refraining from misusing personal confidential knowledge and from becoming personally and sexually involved with plaintiff, improperly handling transference within the legal relationship, and failing to terminate the representation in a responsible manner. Defendant Cooperman-Levitt further had a duty to provide a safe environment for the plaintiff, which included the exercise reasonable care in hiring, retaining, and supervising defendant Newman.

121.    This general duty included, but is not limited to, the following specific fiduciary duties on the part of Newman:

   a. to do nothing that would compromise the exercise of his professional judgment on her behalf, that would lesson his ability to represent her with undivided fidelity or that would otherwise jeopardize her interests in her arbitration by having sexual relations with her;

   b.  to assure both that sexual relations with his client was not a *quid pro quo* for his legal representation and that his client did not agree to sexual relations with him because of her belief that her agreement was a condition of his provision of effective advocacy in her case;

-28-

c.    to assure that her agreement to have sexual relations with him did not arise out of her reliance on him as counselor for personal as well as legal decisions;

d.    to inform her of the potential conflicts of interests that an attorney necessarily creates with his client in an arbitration proceeding when the attorney has sexual relations with the client during the course of those proceedings;

e.    to assure that his engagement in sexual relations with her during the pendency of arbitration proceedings would not be likely to result in emotional distress;

f.    to restrain himself from using his attorney client relationship with plaintiff in order to obtain his own sexual gratification;

g.    not to intimidate plaintiff through threats in order to influence her to abandon or compromise her claims against him; and

h.    to disclose acts that could give rise to malpractice liability.

122.    Defendant Newman breached his fiduciary duty to plaintiff in the following ways:

a.    by inducing her to agree to have sexual relations with him both as an implicit *quid pro quo* for his continued legal representation and under circumstances in which she reasonably felt she needed to submit to his advances in order to ensure the vigorous representation of her interests;

-29-

b. by inducing her agreement to have sexual relations with him because of her trust in and dependence upon his performance of his fiduciary role as her counselor for personal decisions during a period in which she was emotionally distraught and fearful for her future;

c. by using his knowledge of her trust in and dependence upon him as her attorney to gain sexual favors from her;

d. by using knowledge of confidential information gained during his representation of plaintiff to gain sexual favors from her;

e. by having sexual relations with her under circumstances in which those relations created a conflict of interest between his own personal interests and her legal interests, which legal interests he harmed as a result of their sexual relations;

f. by having sexual relations with plaintiff while knowingly and intentionally failing to inform her of the conflicts of interest created by their sexual relationship, and by not taking steps to determine whether her agreement to have sexual relations with him resulted from her belief that it would help her retain adequate representation;

g. by knowingly putting her in a situation that created a substantial and clearly foreseeable likelihood that she would suffer emotional distress as a result of their sexual relationship;

h. by failing to disclose acts that could give rise to malpractice liability; and

i.    by using plaintiff's confidentially-provided information as to her vulnerable emotional and financial circumstances in order to take sexual and economic advantage of her.

123.   Defendant Newman had reason to know that, by breaching his fiduciary duty to plaintiff and entering a sexual relationship with her, she was likely to suffer emotional distress above and beyond what might have been caused had she not been successful in the case against NationsBank.  In fact, the effects of the sexual relationship on plaintiff were devastating.

124.   From August, 1998, defendant Newman initiated sexual intercourse with plaintiff when defendant Newman knew or, should have known through the application of reasonable care and diligence required of attorneys that plaintiff was emotionally vulnerable and susceptible to his romantic overtures, that plaintiff was unable to knowingly and intelligently consent to sexual intercourse with him, and that defendant Newman was abusing the fiduciary relationship by using confidential information gained because of his status as plaintiff's lawyer.

125.   From August, 1998, defendant Newman knew, or should have known, that his romantic and sexual relationship with plaintiff transcended the bounds of decency and contravened defendant Newman's responsibilities to plaintiff to refrain from engaging in a sexual relationship with a client during a pending legal proceeding and to refrain from using confidential information obtained during that attorney/client relationship for his own benefit and to the detriment of plaintiff.

126.   From August, 1998, defendant Newman knew, or should have known through the application of reasonable care and diligence required of attorneys that his romantic and sexual relationship with plaintiff transcended the bounds of decency and contravened defendant Newman's professional responsibilities to plaintiff because plaintiff was debilitated and distraught by the stress of her pending legal proceeding, which debility deprived plaintiff of the means and will to resist defendant Newman's predatory sexual conduct toward her.

127.   In regard to his actions alleged above, defendant Newman acted willfully, wantonly, maliciously, recklessly, and with such wanton dishonesty as to imply criminal indifference to civil obligations.  Defendant Newman's conduct was aggravated and outrageous and constituted conscious action of a reprehensible character.  Defendant Newman acted with intent to injure plaintiff, with deliberate intent to interference with the rights of plaintiff, and consciously disregarding the unjustifiably substantial risk of significant harm to plaintiff, warranting the imposition of punitive damages.

128.   In addition to the pecuniary damages suffered by plaintiff as a result of the loss of her monetary claims and equitable remedies against NationsBank, defendant Newman's conduct in sexualizing the attorney-client relationship caused further emotional, psychological, and physical damage to plaintiff.  Plaintiff has suffered, and will continue to suffer, severe emotional distress requiring professional treatment and therapy for humiliation, depression, embarrassment, anxiety, nervous system disorders, and various other conditions that have burdened her life and that have caused physical

manifestations of emotional distress.   Plaintiff has incurred, and will continue to incur the expense of professional treatment and therapy.

129.    As a direct and proximate result of the sexual misconduct as set forth in this complaint, plaintiff has been impaired in her ability to work and will continue to be impaired in her ability to work.  In addition, plaintiff's social and familial relationships have been impaired and will continue to be impaired.

130.    Defendant Cooperman-Levitt, through its member attorneys, knew or, in the exercise of reasonable care, should have known, that defendant Newman was engaging in improper sexual relations with plaintiff.

131.    Defendant Cooperman-Levitt, through its member attorneys, knew or, in the exercise of reasonable care, should have known, this ongoing unauthorized practice of law and violation of the Disciplinary Rules by defendant Newman was occurring but failed to take any steps to remedy the situation

132.    Defendant Cooperman-Levitt further had a duty to provide a safe environment for the plaintiff, which included the exercise of reasonable care in supervising defendant Newman.

133.    Defendant Cooperman-Levitt breached its fiduciary duty to plaintiff by its failure to supervise defendant Newman, by its failure to halt his conduct or mitigate the adverse effects thereof, by failing to mitigate the damages caused by the conflict of interest, and failing to disclose the malpractice and the conflict of interest, and is therefore directly liable for the resulting damage.

-33-

134.    By reason of the foregoing, plaintiff has been damaged, and continues to be damaged, because of the defendants' breach of fiduciary duty and is entitled to actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court.

**THIRD CAUSE OF ACTION**
Intentional Infliction of Emotional Distress

135.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-134 of this Second Amended Complaint as though fully set forth herein.

136.    The foregoing conduct constitutes extreme and outrageous conduct, in that the defendants' actions transcended all bounds of decency and is to be regarded as atrocious and utterly intolerable in a civilized community.

137.    Defendant Newman engaged in such conduct directly with the intent to cause, or with reckless disregard of a near certainty of causing, plaintiff to suffer severe emotional distress.

138.    Defendant Cooperman Levitt Winikoff Lester & Newman, P.C. is vicariously liable for defendant Newman's intentional infliction of emotional distress.

139.    By reason of the foregoing, plaintiff has been damaged, and continues to be damaged, because of the intentional infliction of emotional distress by defendant Newman and is entitled to actual damages and punitive damages against defendants in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court.

### FOURTH CAUSE OF ACTION
Negligent Supervision (as against Cooperman-Levitt only)

140.    Plaintiff repeats and re-alleges the allegations in paragraphs 1-139 of this Second Amended Complaint as though fully set forth herein.

141.    Plaintiff had an attorney-client relationship with defendant Cooperman-Levitt.

142.    Defendant Cooperman-Levitt had a duty to provide a safe environment for the plaintiff's legal representation which included the exercise reasonable care in supervising defendant Newman.

143.    Defendant Cooperman-Levitt had a duty under applicable attorney ethical rules to exercise reasonable care in supervising defendant Newman.

144.    Defendant Cooperman-Levitt breached its duty of supervision over defendant Newman by not supervising him adequately.

145.    All of defendant Newman's above-described sexual relations with, and other improper conduct toward, plaintiff as alleged above occurred while he was engaged on behalf of defendant Cooperman-Levitt in rendering of legal services to plaintiff.

146.    Defendant Cooperman-Levitt's failure to exercise reasonable care in the supervision of defendant Newman was a direct and proximate cause of plaintiff's damages, as described above.

147.    By reason of the foregoing, plaintiff has been damaged, and continues to be damaged, because of the intentional infliction of emotional distress by the defendants and

-35-

is entitled to actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court.

WHEREFORE, plaintiff Renee Cecala demands judgment against defendants David B. Newman and Cooperman Levitt Winikoff Lester & Newman, P.C., jointly and severally, on each cause of action asserted herein awarding the following relief:

A.    on the First Cause of Action, actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court, plus prejudgment interest and costs of this suit;

B.    on the Second Cause of Action, actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court, plus prejudgment interest and costs of this suit;

C.    on the Third Cause of Action, actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court, plus prejudgment interest and costs of this suit;

D.    on the Fourth Cause of Action, as against defendant Cooperman-Levitt only, actual damages and punitive damages in an amount to be determined at trial, but in any event in excess of the $75,000 jurisdictional threshold of this Court, plus prejudgment interest and costs of this suit;

E.    Such other and further relief as the Court deems just and proper.

Dated this 26th day of October, 2005.

SCHWARTZ & PONTERIO, PLLC
134 West 29th Street – Suite 1006
New York, New York 10001-5304
Telephone: (212) 714-1200

PAUL G. ULRICH, P.C. - 00424800
131 East El Caminito Drive
Phoenix, Arizona 85020-3503
Telephone: (602) 248-9465

Attorneys for Plaintiff

By:    s/ _Matthew F. Schwartz_

Matthew F. Schwartz

I hereby certify that I electronically
transmitted the foregoing document to
the Clerk's Office using the CM/ECF System
for filing and transmittal of a Notice of
Electronic Filing to the following CM/ECF
registrants, and mailed a copy of same to any
non-registrants this 26th day of October, 2005:

     Brian Holohan, Esq.
     Hinshaw & Culbertson LLP
     3800 N. Central Avenue – Suite 1600
     Phoenix, Arizona 85012

I will also cause a hard copy of the foregoing
to be delivered today to:

     Hon. Neil V. Wake
     United States District Court
     District of Arizona
     401 Washington Street
     Phoenix, Arizona 85003

By:   s/ *Matthew F. Schwartz*

     Matthew F. Schwartz