1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9  Renee Cecala,                    )    No. CV 04-02612-PHX-NVW
                                    )
10            Plaintiff,            )    **ORDER**
                                    )
11  vs.                             )
                                    )
12                                  )
   David B. Newman; Cooperman Levitt )
13  Winikoff Lester & Newman, P.C.,  )
                                    )
14            Defendants.           )
                                    )
15  _____)

16                            Table of Contents

17  I.    Factual Background  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18        A.    NationsBank  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

19              1.    The Underlying Employment Dispute  . . . . . . . . . . . . . . . . . . . . . . . 1

20              2.    Retaining Lawyer Newman  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

21              3.    Mitigation of Damages  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

22              4.    Litigation Strategy  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

23        B.    NASD Arbitration  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

24        C.    Cecala's Relationship with Newman . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

25        D.    Malpractice Litigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

26  II.   Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

27  III.  Legal Malpractice in Arizona . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28                                       i

1     A.    Two Theories of Malpractice Liability . . . . . . . . . . . . . . . . . . . . . . . 7

2     B.    A Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

3         1.    Cognizable Injury . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

4         2.    Attorney Negligence Malpractice . . . . . . . . . . . . . . . . . . . . . . . 8

5         3.    Fiduciary Breach Malpractice . . . . . . . . . . . . . . . . . . . . . . . . . 9

6     C.    Trial Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

7     D.    Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

8         1.    "But-For" Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

9         2.    Proximate Causation and Foreseeability of the Injury . . . . . . . . 13

10        3.    But-For Causation and Proximate Causation in Litigation
              Malpractice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

11

12             i.    Subversion of the But-For Causation Requirement . . . . . . . 15

13             ii.    The Judgment Error Rule, Speculativeness, and Lack of
                 Foreseeability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

14         4.    Fiduciary Breach Malpractice . . . . . . . . . . . . . . . . . . . . . . . . . 17

15 V.   Cecala's Second Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16 VI.  Negligent Supervision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17 VII. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18     A.    The *Amfac* Cases: Errors in Litigation . . . . . . . . . . . . . . . . . . . . . . . 21

19     B.    *Amfac* Does Not Apply to Non-Litigation Injury . . . . . . . . . . . . . . . . . 22

20     C.    "Unsound Mind" Tolling Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . 23

21         1.    The Meaning of "Unsound Mind" . . . . . . . . . . . . . . . . . . . . . . . 23

22         2.    Quantum of Evidence to Defeat Summary Judgment . . . . . . . . . . 24

23         3.    Insufficient Evidence of Inability to Understand Legal Rights . . . 27

24         4.    Insufficient Evidence of Inability to Manage Daily Affairs . . . . . 28

25             i.    Expert Affidavits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

26                 a.    Dr. Rutter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

27                 b.    Dr. Harrison . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

28                 c.    Dr. Wilson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

ii.     Declarations of Family and Friends . . . . . . . . . . . . . . . . . . 32

        a.    1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

        b.    2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        c.    2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

        d.    2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

iii.    Rule 56(c) Declarations . . . . . . . . . . . . . . . . . . . . . . . . . 35

    5.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

D.    Equitable Tolling Is Unwarranted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII.  Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

A.    Cecala's Theory of Causation Is Insufficient . . . . . . . . . . . . . . . . . . . . 38

B.    Procedural Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    1.    Newman Carried His Initial Burden under Rule 56(c) . . . . . . . . . 41

    2.    Cecala's Supplemental Expert Affidavit Was Untimely . . . . . . . 42

C.    Causation Evidence from Elliot's Affidavits . . . . . . . . . . . . . . . . . . . . . . 45

    1.    Newman's "Ineffective Representation" . . . . . . . . . . . . . . . . . . . 45

    2.    Improper Selection of and Hostile Attitude Toward the NASD Arbitrators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    3.    Inadequate Discovery: Failure to File with the EEOC . . . . . . . . 49

    4.    Loss of a Procedural Advantage:  Foregoing Litigation . . . . . . . . 50

    5.    Termination of the Representation . . . . . . . . . . . . . . . . . . . . . . . 51

D.    Other Evidence of Causation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    1.    Hostile Work Environment Sexual Harassment Claim . . . . . . . . 53

    2.    Disparate Treatment Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    3.    Evidence of Litigation Injury from Sexual Relationship . . . . . . . 55

IX.  Failure to Assert Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

A.    Retaliatory Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

B.    Constructive Discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    1.    Prima Facie Case for Constructive Discharge . . . . . . . . . . . . . . 59

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        2.     The Omitted Allegation of Constructive Discharge Is Not Economically Viable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

C.      Failure to Mitigate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .62

D.      Lost Opportunity to Recover Nominal Damages at a Net Loss to the Client Is Not Actionable Malpractice  . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

1    Pending before the court are Defendants' Motion for Summary Judgment and
2    Statement of Facts, as amended ("DSOF") (Doc. ## 171, 172, 246); Plaintiff's Response and
3    Statement of Facts, as amended ("PSOF") (Doc. ## 193, 188, 220); and Defendants' Reply
4    (Doc. # 206).

5    Also before the court are Plaintiff's Notice of Filing (Doc. # 224) and Defendants'
6    Motion to Strike Cecala Declaration and Elliot Supplemental Affidavit (Doc. # 227).  The
7    court has reviewed the parties' supplemental memoranda (Doc. ## 228, 229, 230) and the
8    responses thereto (Doc. ## 236, 237, 238).

9    **I.    Factual Background**

10    Construing the evidence in the light most favorable to Plaintiff, and drawing all
11    reasonable inferences in her favor, the admissible evidence shows the following.

12    **A.    NationsBank**

13    This is an action for legal malpractice arising out of an employment dispute between
14    Plaintiff Renee Cecala ("Cecala") and her former employer, NationsBank ("Bank"), now
15    Bank of America.  Cecala began working for NationsBank in Charlotte, North Carolina in
16    June 1994.  (PSOF 19-20; DSOF Ex. 3, 4.)  Cecala worked at various times in the capital
17    markets, mortgage financing, and mortgage sales divisions of the Bank.  (PSOF 19-20.)

18    **1.    The Underlying Employment Dispute**

19    Cecala contends that NationsBank discriminated against her because of her sex.  (*Id*.
20    at 20.)  She  "was not compensated fairly, compared to others similarly situated at the Bank,
21    and at other like institutions," and was denied promotions and deprived of human resources
22    by Bank management.  (*Id*. at 20-23; Ex. 18 at 2.)  Cecala believes that she "flourished and
23    even fostered growth and prosperity within two distinct departments" despite the "woefully
24    inadequate support and resources she received."  (*Id*. Ex 18 at 2.)  In addition to general
25    underpayment and lack of resources, Cecala alleges that she was "victimized by sexual
26    harassment [and] a hostile work environment" at NationsBank.  (Doc. # 193 at 3; PSOF 23-
27    24.) The Bank's "oppressive and hostile work environment . . . caused her great physical and
28    emotional distress."  (*Id*. Ex. 18 at 2.)

1

1     From 1994 through 1996, Cecala lodged complaints with senior Bank management

2     about "compensation, promotions, and resources," but NationsBank did not address her

3     concerns.  (*Id*. at 21.)

4           **2.     Retaining Lawyer Newman**

5     In January 1997, Cecala hired New York attorney David B. Newman of the law firm

6     of Cooperman Levitt Winikoff Lester & Newman, P.C. ("Cooperman Levitt"), to represent

7     her in negotiations with NationsBank.  (Doc. # 171 at 3.)  Newman sent a letter to the

8     president of NationsBank Capital Markets on February 20, 1997, briefly describing Cecala's

9     concerns and expressing his desire "to discuss this matter with you with the hope of resolving

10    these issues short of further legal action." (DSOF Ex. 5.)  The Bank replied:  "We view this

11    is an internal matter and will work with Ms. Cecala to address any concerns she may have."

12    (*Id*. Ex. 6.)

13    Bank officials did meet with Cecala on several occasions.  (DSOF Ex. 1, RC-00368-

14    72 (arbitration transcript hereinafter referenced by Bates number).)  In an effort to resolve

15    Cecala's allegations of gender discrimination, the Bank promised her a "meaningful role" in

16    the mortgage finance department, and offered a $10,000 increase in compensation to match

17    her alleged male comparator.  (RC-00370.)  Cecala refused the offer as unresponsive to her

18    concerns, unreasonable, and unfair.  (RC-00371.)  Cecala alleges that NationsBank retaliated

19    by, among other things, "interrogat[ing]," "embarrass[ing]," ostraciz[ing]," "ignor[ing]" and

20    "[freezing her] out of the work she had been doing."  (Doc. # 193 at 3; PSOF 18.)  "These

21    conditions became so intolerable that, in March 199[7], she resigned."  (Doc. # 193 at 3.)

22    Cecala did not seek legal advice from Newman before making this decision.  Whether Cecala

23    voluntarily resigned or was "constructively discharged" for complaining about her working

24    conditions is disputed by the parties, as discussed below.  (Doc. # 229 at 3-7.)

25           **3.     Mitigation of Damages**

26    Cecala interviewed for an investment banking job at Goldman Sachs, New York,

27    shortly after resigning from NationsBank.  (PSOF 1.)  Although she now denies it (*Id*. at 1-

28    2), Cecala originally testified that Goldman Sachs offered to hire her as an investment

1    banker. (RC-00748-49.) Cecala declined the offer upon learning that her salary and benefits

2    at Goldman Sachs would not exceed the compensation provided by NationsBank, which she

3    viewed as "below market," "discriminatory," and "one of the reasons [she] resigned from

4    NationsBank" in the first instance. (RC-00749; PSOF 2.) Cecala does not recall discussing

5    the Goldman Sachs offer or any other issue related to mitigation of damages with her

6    attorney. (*Id*. at 2.)

7                    **4.      Litigation Strategy**

8          Lawyer Newman commenced arbitration under the auspices of the National

9    Association of Securities Dealers ("NASD") in September 1997. (Doc. # 171 at 5.)

10   Newman's choice of forum was influenced by the arbitration agreement executed by Cecala

11   in connection with her employment at NationsBank (*Id*. at 5.) The Statement of Claim

12   alleges, among other things, a right of action under Title VII of the Civil Rights Act of 1964,

13   42 U.S.C. § 2000e *et seq*, for disparate pay and career advancement relative to Cecala's male

14   colleagues, and hostile work environment sexual harassment. (DSOF Ex. 9.) Newman's

15   initiatory pleading did not include a claim for retaliation or an allegation of constructive

16   discharge. (Doc. # 193 at 16.)

17         Newman and his associate Kenneth Rubinstein also contemplated filing a charge

18   against NationsBank with the Charlotte District Office of the Equal Employment Opportunity

19   Commission ("EEOC"). In the summer of 1997, Newman and Mr. Rubinstein drafted an

20   affidavit and sought local North Carolina counsel for that purpose. (Doc. ## 171 at 6; 182

21   Ex. B Attach. 1-2.) Cecala's lawyers never lodged a charge with the EEOC. (PSOF 4; Ex.

22   14 at 12.)

23                  **B.      NASD Arbitration**

24         Pursuant to NASD procedure, a three-member panel convened in Charlotte, North

25   Carolina, for 18 full days (36 half-day sessions) of arbitration between August 6, 1998, and

26   October 20, 1999 (Case No. 97-04551). (DSOF Ex. 14 at 3-4.) Newman represented Cecala

27   before the tribunal for 34 of the half-day sessions, until June 21, 1999, when Cecala formally

28   discharged him under disputed circumstances. (Doc. # 193 at 5.) Cecala demanded her

1   client file shortly thereafter, but Newman refused to return it until 2000 because of a billing

2   dispute. (Doc. # 171 at 6; Cecala Dep. Jan. 5, 2007 p. 302.) Cecala attempted to retain a new

3   lawyer in July 1999. (Doc. # 182 Ex. B, 1.) She was unsuccessful, and Cecala represented

4   herself during the last two arbitration hearings in October 1999. (DSOF Ex. 14 at 2; Doc.

5   # 246; Doc. # 171 at 6.)

6        Cecala's testimony in the arbitration hearing was contradicted by witness after witness

7   from the Bank. She suffered a withering cross-examination gravely injurious to specific

8   assertions and to her credibility in general. (*E.g.*, RC-00479-81; RC-00658; RC-00664; RC-

9   007611-13; RC-01129-34.)

10       The NASD arbitrators rendered their award on February 10, 2000, finding in favor of

11  NationsBank on all claims. Cecala attempted to vacate the adverse decision of the arbitral

12  tribunal in the federal courts pursuant to Section 10(a) of the Federal Arbitration Act, 9

13  U.S.C. (Doc. #182 Ex. B at 2.) She was unsuccessful. *Cecala v. NationsBank Corp.*, No:

14  3:00-mc-00039 (D.N.C. Apr. 4, 2001) (denying the motion to vacate); *Cecala v. NationsBank*

15  *Crop*, 40 Fed. Appx. 795, 796 (4th Cir. 2002) (upholding the district court's decision). The

16  NASD award became finally enforceable on November 21, 2002. (Doc. # 65 at 2.)

17       **C.   Cecala's Relationship with Newman**

18       Cecala alleges that she had a non-consensual, sexual relationship with lawyer

19  Newman. She contends further that their "relationship . . . adversely affect[ed] [Newman's]

20  legal representation." (Doc. # 193 at 4.) Cecala submits that Newman "engaged in sexual

21  conduct, including sexual contact" with her on multiple occasions and in various locations

22  from August 1998, through June 14, 1999, "as a condition to perform legal services" and

23  without her effective consent. (*Id*. at 15-17.)

24       Cecala terminated her sexual relationship with Newman on the eve of the June 1999,

25  arbitration hearing. "Just before the hearing date Ms. Cecala reached her breaking point.

26  She became so distraught and upset with Newman that she fired him–or, more accurately,

27  his conduct caused her to fire him–preferring to go it alone rather than continue to endure his

28  demands for sex." (*Id*. at 5.) Newman denies that he had a sexual relationship with Cecala,

4

1   and he offers an alternative explanation for his discharge in a June 17, 1999 memorandum.

2   (DSOF Ex. 3 at 2; Ex. 10.)

3          Cecala was severely affected by her relationship with Newman and her litigation

4   losses both in the NASD arbitration and in the federal courts.  (PSOF 25-29.)

5          **D.     Malpractice Litigation**

6          Cecala first considered taking legal action against her former attorney between

7   December 1999 and January 2000.  (DSOF Cecala Dep. 163.)  Cecala contacted the North

8   Carolina law firm of Ferguson Stein Chambers in "early 2002, to discuss representation in

9   pursuing Mr. Newman for malpractice," but she did not retain counsel at that time.  (Doc. #

10  182 Ex. B, 2.)

11         Cecala filed a pro se lawsuit for malpractice against Newman and his law partners at

12  Cooperman Levitt in the Maricopa County Superior Court on April 18, 2003. (DSOF Ex. 16.)

13  The case was dismissed for lack of prosecution.  (Doc. # 171 at 7.)

14         After she retained counsel, Cecala resumed legal action against her former attorney

15  and his firm in federal court on November 21, 2004.  (Doc. # 1.)  The court has jurisdiction

16  over this action pursuant to 28 U.S.C. § 1332(a)(1).

17  **II.    Summary Judgment Standard**

18          Rule 56(c), Fed. R. Civ. P., provides that summary judgment is proper when "the

19  pleadings, depositions, answers to interrogatories, and admissions on file, together with

20  affidavits, if any, show that there is no genuine issue as to any material fact and that the

21  moving party is entitled to a judgment as a matter of law."  The court must evaluate a party's

22  motion for summary judgment construing the alleged facts with all reasonable inferences

23  favoring the nonmoving party.  *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th

24  Cir. 2001).  The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).

25  Conclusory and speculative testimony in affidavits and moving papers is insufficient to raise

26  genuine issues of fact and to defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE*

27  *Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

28

1    The party seeking summary judgment bears the initial burden of informing the court
2  of the basis for its motion and identifying those portions of the pleadings, depositions,
3  answers to interrogatories, and admissions on file, together with the affidavits, if any, which
4  it believes demonstrate the absence of any genuine issue of material fact.  *See Celotex Corp.*
5  *v. Catrett*, 477 U.S. 317, 323 (1986).  The nature of this responsibility varies, however,
6  depending on whether the legal issues are ones on which the movant or the non-movant
7  would bear the burden of proof at trial.  If the burden of persuasion at trial would be on the
8  nonmoving party, the party moving for summary judgment may carry its initial burden of
9  production under Rule 56(c) by producing "evidence negating an essential element of the
10  nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving
11  party does not have enough evidence of an essential element of its claim or defense to carry
12  its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210
13  F.3d 1099, 1105-06 (9th Cir. 2000); *High Tech Gays v. Defense Indus. Sec. Clearance*
14  *Office*, 895 F.2d 563, 574 (9th Cir. 1990).

15    Where the moving party has met its initial burden with a properly supported motion,
16  the party opposing the motion "may not rest upon the mere allegations or denials of his
17  pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."
18  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1985).  Summary judgment is
19  appropriate against a party who "fails to make a sufficient showing to establish the existence
20  of an element essential to that party's case, and on which that party will bear the burden of
21  proof at trial."  *Celotex Corp.*, 477 U.S. at 322; *Matsushita Elec. Indus. Co. v. Zenith Radio*
22  *Corp.*, 475 U.S. 574, 586, (1986) (nonmovant's showing of "some metaphysical doubt" as
23  to material facts insufficient); *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th
24  Cir. 1994).  Summary judgment is not appropriate when the nonmoving party identifies or
25  produces evidence from which a reasonable juror, drawing all inferences in favor of the
26  nonmoving party, could return a verdict in the nonmoving party's favor.  *United States v.*
27  *Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999).

28

6

1    **III.    Legal Malpractice in Arizona**

2          The court has not been favored with any briefing as to whether the substantive law of

3    Arizona or that of any other jurisdiction in which Newman's conduct occurred supplies the

4    rule of decision in this diversity action.  The court therefore takes it that Arizona law applies

5    and that Cecala and Newman have waived any different position. (Doc. ## 171, 193.)

6    Arizona adheres in all significant respects to the majority view of legal malpractice.

7    Therefore, it is unlikely that application of the law of New York or North Carolina would

8    lead to a different result.

9          **A.    Two Theories of Malpractice Liability**

10          In Arizona, "an attorney must act for his client in a reasonably careful and skillful

11   manner in light of his special professional knowledge." *Martin v. Burns*, 102 Ariz. 341, 343,

12   429 P.2d 660, 662 (1967).  A lawyer is also a fiduciary with a duty of loyalty, confidentiality,

13   and obedience to the client.  *In re Estate of Shano*, 177 Ariz 550, 557, 869 P.2d 1203, 1210

14   (Ct. App. 1993).  Indeed, "[t]he Arizona courts have long held that an attorney is bound to

15   discharge his duties to his client with strictest fidelity and to observe the highest and utmost

16   good faith."  *Talbot v. Schroeder*, 13 Ariz. App. 230, 231, 475 P.2d 520, 521 (1970); *see*

17   *Meinhard v. Salmon*, 249 N.Y. 458, 464, 165 N.E. 545, 546 (1928) (Cardozo, J.).

18          The duties of care and loyalty, though coextensive, create two independent bases of

19   tort liability in Arizona. *See Barmat v. John & Jane Partners A-D*, 155 Ariz. 519, 522, 747

20   P.2d 1218, 1221 (1987); *Schroder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114 (Ct. App. 1984).

21   A duly licensed attorney may be liable in Arizona for departing from the applicable standard

22   of care under the law of negligence.  As a fiduciary, the lawyer may also be liable for

23   breaching his duties of loyalty and confidentiality.  Leading commentators distinguish the

24   bases of malpractice liability as follows:  "[A]n attorney's duties to a client include two

25   obligations: (1) competent representation and (2) compliance with fiduciary obligations. The

26   fiduciary obligations set a standard of 'conduct,' analogous to the standard of 'care,' which

27   pertains to the requisite skill, knowledge and diligence.  Thus, the standard of care concerns

28   negligence and the standard of conduct concerns breach of loyalty or confidentiality."  2

1   Ronald E. Mallen & Jeffery M. Smith, *Legal Malpractice* § 14:2 at 585-86 (2007)

2   (hereinafter "*Legal Malpractice*"); Restatement (Third) of the Law Governing Lawyers § 49

3   (2000) (tracking this distinction).

4       It follows that an attorney may be liable for malpractice under Arizona law for

5   departing from the standard of care, for breaching the standard of conduct, or both. *See*

6   *Smith v. Mehaffy*, 30 P.3d 727, 733 (Colo. Ct. App. 2000) (distinguishing, in a practical

7   manner, between the dual bases of malpractice liability).

8       **B.    A Prima Facie Case**

9       Although held to standards of care and loyalty, lawyers are not guarantors of

10  successful litigation outcomes. *Talbot*, 13 Ariz. App. at 231, 475 P.2d at 521.  Malpractice

11  liability attaches only when the breach of the applicable standard of care or conduct is the

12  cause in fact and legal cause of a cognizable injury to the client.

13      **1.    Cognizable Injury**

14      In an action for legal malpractice, "injury" means "the loss of a right, remedy or

15  interest, or the imposition of liability." 3 *Legal Malpractice* § 20:1 at 3.  A cause of action

16  for legal malpractice, whether sounding in negligence or fiduciary breach, will not lie where

17  "mental injury is the sole complaint." *Id*. § 20:11 at 31; *Deno v. Transamerica Title Co.*, 126

18  Ariz. 527, 530, 617 P.2d 35, 38 (Ct. App. 1980).

19      "Damages," in contrast, concern "the measure of that injury." *Id*. at 3; *Commercial*

20  *Union Ins. Co. v. Lewis & Roca*, 183 Ariz. 250, 255 n.4, 902 P.2d 1354, 1359 n.4  (Ct. App.

21  1995).  As discussed in further detail below, economic damages proximately caused by

22  malpractice are recoverable, and mental injury damages may also be awarded pursuant to

23  Arizona law if they are a consequence of the attorney's "willful fiduciary breach." *Reed v.*

24  *Mitchell & Timbanard, P.C.*, 183 Ariz. 313, 318, 903 P.2d 621, 626 (Ct. App. 1995).

25      **2.    Attorney Negligence Malpractice**

26      The "basic elements" of a prima facie case for attorney negligence are the same "as

27  in any negligence action." *Phillips v. Clancy*, 152 Ariz. 415, 418, 733 P.2d 300, 303 (Ct.

28  App. 1986).  To make a prima facie case, the plaintiff must establish: "(1) the existence of

8

1   an attorney-client relationship which imposes a duty on the attorney to exercise that degree
2   of skill, care, and knowledge commonly exercised by members of the profession, (2) breach
3   of that duty, (3) that such negligence was the proximate cause of resulting injury, and (4) the
4   fact and extent of the injury." *Id*. at 418, 733 P.2d at 303.

### 3.   Fiduciary Breach Malpractice

6        The Arizona courts have not specifically addressed the elements of a claim of
7   malpractice sounding in fiduciary breach.  As a general matter, this cause of action entitles
8   "a protected person (such as a beneficiary of an express trust or a client), commonly referred
9   to as the principal, to recover against a person (such as a trustee or a lawyer), commonly
10  called the agent, for a violation of the duties of the fiduciary."  Charles W. Wolfram, *A*
11  *Cautionary Tale: Fiduciary Breach as Legal Malpractice*, 34 Hofstra L. Rev. 689, 705
12  (2005).  "That concept has a long history in decisions finding a lawyer liable to a client for
13  fiduciary breach, and it remains the base of all such claims."  *Id*.

14       The Arizona Supreme Court would likely conclude, in line with the majority view,
15  that "the essential elements of legal malpractice based on breach of fiduciary duty include
16  the following: (1) an attorney-client relationship; (2) breach of the attorney's fiduciary duty
17  to the client; (3) causation, both actual and proximate; and (4) damages suffered by the
18  client."  *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1290-93 (Utah Ct. App. 1996);
19  *accord* 2 *Legal Malpractice* § 14:2 at 589; Restatement (Third) of the Law Governing
20  Lawyers § 49 cmt. e (2000) ("[T]he rules concerning causation, damages, and defenses that
21  apply to lawyer negligence actions also govern actions for breach of fiduciary duty.").

22       Proof of a cognizable injury is required to state a claim for malpractice, whether
23  sounding in negligence or fiduciary breach.  *See Schweizer v. Mulvehill*, 93 F. Supp. 2d 376,
24  395-96 (S.D.N.Y. 2000) ("The loss attributable to malpractice must be real and not
25  hypothetical, and the damages must be readily measurable in economic terms.")  The client's
26  after-the-fact emotional suffering from a consensual sexual relation with her attorney is not
27  actionable without more.  "Intangibles such as shame, humiliation, and emotional distress"
28  do not constitute "injury" for fiduciary breach malpractice, as "[p]ermitting . . . intangible

9

1    injury in the form of emotional distress to replace proof of actual damages would circumvent

2    the statutory limitations on such claims as criminal conversation and alienation of

3    affections." Margit Livingston, *When Libido Subverts Credo: Regulation of Attorney-Client*

4    *Sexual Relations*, 62 Fordham L. Rev. 5, 28 (1993).

5          A New York trial court recently applied this rule to deny recovery to a plaintiff-client

6    who entered into a consensual sexual relationship with her attorney without any

7    independently inappropriate conduct on the part of the lawyer, such as coercion.  *Guiles v.*

8    *Simser*, 804 N.Y.S.2d 904 (Sup. Ct. 2005), *aff'd*, 35 A.D.3d 1054, 826 N.Y.S.2d 484 (2006).

9    "Unlike the typical case . . . there is no evidence here that defendant misused information

10   disclosed by the client in any manner resulting in a detriment to her legal position or that he

11   bartered his services for sex.  Nor is there any proof of damages to the client by reason of

12   erroneous, inadequate or laggardly legal advice or dilatory tactics by the lawyer in dealing

13   with the matter entrusted to him . . . . In short, plaintiff has shown no injury to her position

14   in relation to her case." *Id.* at 908; *Vallinoto v. DiSandro*, 688 A.2d 830, 835 (1997) (same);

15   *cf.  McDaniel v. Gile*, 281 Cal. Rptr. 242 (Cal. Ct. App. 1991) (attorney's withholding of

16   legal services to gain sexual favors, where the quid pro quo caused client's legal position in

17   divorce action to suffer, was a cognizable injury for purposes of breach of fiduciary duty and

18   constituted outrageous conduct for claim of intentional infliction of emotional distress).

19         **C.    Trial Methodology**

20         The "case-within-a-case" method is the "accepted and traditional means of resolving

21   the issues involved in the underlying proceeding in a legal malpractice action," whether

22   sounding in negligence or breach of fiduciary duty.  4 *Legal Malpractice* § 33:9 at 1046.

23   Under this approach, "the allegedly negligent attorney becomes the proxy for or steps into

24   the shoes of the original offending defendant." *Arciniega v. Bank of San Bernardino*, 52 Cal.

25   App. 4th 213, 230, 60 Cal. Rptr. 2d 495, 506 (Ct. App. 1997).  The *Arciniega* court observed

26   that the "misperforming lawyer is deemed to constitute the same 'target,' legally speaking,

27   as the original offending defendant.  Because of the legal malpractice, the original target is

28   out of range; thus, the misperforming attorney must stand in and submit to being the target

1    instead of the former target which the attorney negligently permitted to escape.  This is the

2    essence of the case-within-a case doctrine."  *Id.* at 230, 60 Cal. Rptr. 2d at 506.

3        "In a jury trial, the court examines the elements of a cause of action for legal

4    malpractice or of an asserted defense to determine what issues the court will decide and what

5    issues will be submitted to the jury." 4 *Legal Malpractice* § 33:12 at 1079.  In *Phillips*, the

6    Arizona Court of Appeals considered the issue of the "appropriate arbiter," and concluded

7    that the resolution of "legal issues . . . is reserved for the exclusive province of judges," while

8    "the jury in the malpractice case should decide the disputed factual issues pertaining to the

9    original suit."  152 Ariz. at 421, 733 P.2d at 306; *Molever v. Roush*, 152 Ariz. 367, 374, 732

10   P.2d 1105, 1112 (Ct. App. 1986).  The division of responsibility between the judge and the

11   jury is "founded on the premise that the object of the second trial is not to determine what

12   the original judge would actually have done.  Rather, the issue in the malpractice case is what

13   the outcome *should* have been if the issue had been properly presented." *Phillips*, 152 Ariz.

14   at 421-22, 733 P.2d at 306-07 (citation and internal quotations omitted) (emphasis in

15   original).

16       "A jury is fully capable of replicating the judgment of another fact-finding tribunal,

17   whatever its composition." *Id.* at 421-22, 733 P.2d at 306-07 (citation and internal quotations

18   omitted).  However, "no matter the factual issue, the . . . rule is that, if the evidence is

19   undisputed or so conclusive that reasonable persons would not disagree, the resolution

20   presents a question of law for the court."  4 *Legal Malpractice* § 33:12 at 1080; *Talbot*, 13

21   Ariz. App. at 231, 475 P.2d at 521 (same).

      **D.    Causation**

            **1.    "But-For" Causation**

24       When the malpractice sounds in negligence, "the plaintiff must prove that but for the

25   attorney's negligence, he would have been successful in the prosecution or defense of the

26   original suit." *Phillips*, 152 Ariz. at 418, 733 P.2d at 303.  "Conversely, 'but-for' causation

27   does not exist if the event would have occurred without the lawyer's conduct."  1 *Legal*

28   *Malpractice* § 8:5 at 984.  "Where the attorney's error was an omission, the inquiry is,

1   assuming the attorney performed the act, would the plaintiff have achieved the claimed

2   benefit?" *Id*. at 984.

3         To prove "but-for" causation, the plaintiff must show that causation by the defendant's

4   act or omission is reasonably likely, not merely possible.  This is the holding of *Purcell v.*

5   *Zimbelman*, 18 Ariz. App. 75, 500 P.2d 335 (1972), a case involving medical rather than

6   legal malpractice.  *See LeapSource, Inc. v. GTCR Golder Rauner, L.L.C.*, 351 B.R. 685 (D.

7   Ariz. 2006) (applying *Purcell* to a claim of legal malpractice).  The *Purcell* court held that

8   "[a]n essential element of the plaintiff's cause of action for negligence is that there must be

9   some reasonable connection between the act or omission of the defendant and the damage

10   which the plaintiff has suffered." 18 Ariz. App. at 82, 500 P.2d at 342.  Thus, the plaintiff

11   "must introduce evidence which affords a reasonable basis for the conclusion that it is more

12   likely than not that the conduct of the defendant was a substantial factor in bringing about

13   the result." *Id*. at 82, 500 P.2d at 342.  "Although a mere possibility of such causation is not

14   enough, the plaintiff is not required to prove his case beyond a reasonable doubt and he need

15   not negate entirely the possibility that defendant's conduct was not a cause."  *Id*. at 82, 500

16   P.2d at 342.  "All that is required in negligence cases is for the plaintiff to present probable

17   facts from which negligence and causal relations may reasonably be inferred."  *Id*. at 82, 500

18   P.2d at 342; *Thompson v. Sun City Cmty. Hosp*., 141 Ariz. 597, 606, 688 P.2d 605, 614

19   (1984) ("[p]laintiff fails in his burden of proof and a verdict is directed if the evidence does

20   not warrant a finding that the chance of recovery . . . absent defendant's negligence, was over

21   50%"); *Salt River Valley Water Users' Ass'n v. Blake*, 53 Ariz. 498, 503-04, 90 P.2d 1004,

22   1007 (1939) ("juries may not return verdicts on surmise or speculation" as to the cause-in-

23   fact of the injury).

24         The meaning of "but-for"causation in the context of legal malpractice is addressed in

25   *Hyatt Regency Phoenix Hotel Co. v. Winston*, 184 Ariz. 120, 137, 907 P.2d 506, 523 (Ct.

26   App. 1995), an action for attorney negligence.  The court endorsed a jury instruction that

27   "[m]alpractice causes economic loss if it helps to produce the loss and the economic loss

28   *would not have happened without the malpractice*," observing that the "emphasized language

1    has the same meaning as the 'but for' formulation, and it is the preferred instruction in

2    negligence cases." *Id.* at 137, 907 P.2d at 523 (emphasis in original).

3        The case-within-a-case methodology requires the appropriate arbiter to determine

4    what the result "*should* have been," not what it "could have been." *Phillips*, 152 Ariz. at 421,

5    733 P.2d at 306 (emphasis in original).  Determining what "could have" or "might have"

6    been decided in the underlying action is speculative and is not the objective of an action for

7    legal malpractice.  4 *Legal Malpractice* § 33:8 at 1044.  "Those allegations are not sufficient

8    for sustaining causation in a complaint." *Id.* at 1044.  "Where proof of causation would be

9    left to the jury's speculation, a directed verdict is properly entered." *Tennen v. Lane*, 149

10   Ariz. 94, 97, 716 P.2d 1031, 1034 (1986).

11               **2.     Proximate Causation and Foreseeability of the Injury**

12       The malpractice plaintiff must also show that the attorney's departure from the

13   standard of care was the legal or proximate cause of her injury.  *Standard Chartered PLC v.

14   Price Waterhouse*, 190 Ariz. 6, 32, 945 P.2d 317, 345 (Ct. App. 1996);  *Rogers v. Retrum*,

15   170 Ariz. 399, 401 (Ct. App. 1991) (distinguishing between cause in fact and legal cause);

16   *Phillips*, 152 Ariz. at 418, 733 P.2d at 303 (requiring both "but-for" and "proximate"

17   causation); *see Royal Ins. Co. of Am. v. Stockbridge, P.C.*, 133 F. Supp. 2d 747, 758 (D. Md.

18   2001) (distinguishing between cause in fact and legal cause in attorney-negligence

19   malpractice).

20       In *McDowell v. Davis*, 104 Ariz. 69, 71, 488 P.2d 869, 871 (1968), a case involving

21   the negligent operation of an automobile, the court observed that "proximate cause" has been

22   unvaryingly defined in this State as follows:

23       The proximate cause of an injury is that which, in a natural and continuous sequence,
         unbroken by any efficient intervening cause, produces an injury, and without which
24       the injury would not have occurred.

25   *Id.* at 71, 488 P.2d at 871.  This definition of proximate causation subsumes the  separate

26   requirement of cause in fact.  "A prerequisite to any determination of proximate cause is a

27   showing of cause in fact; the defendant's wrongful conduct must be a cause in fact of the

28   plaintiff's injury before there can be liability." Jefferson L. Lankford & Douglas A. Blaze,

1-4 *The Law of Negligence in Arizona* § 4.02 (3d ed. 2005) (citation and internal quotations omitted) (hereinafter "*Negligence in Arizona*").

In *Robertson v. Sixpence Inns of America, Inc*., 163 Ariz. 539, 789 P.2d 1040 (1990), a failure-to-warn case, the court explained that proximate cause focuses on the foreseeability of the injury, not the degree of culpability of the defendant or the amount of harm caused by his particular act or omission. "The defendant's act or omission need not be a 'large' or 'abundant' cause of the injury," the court explained. *Id*. at 546, 789 P.2d at 1047. "[E]ven if the defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for the conduct." *Id*. at 546, 789 P.2d at 1047 (citations and internal quotations omitted). The concept was illustrated with a discussion of intervening causes. Under Arizona's formulation of "proximate cause," an "efficient intervening cause" can absolve a tortfeasor from liability even if he was the cause in fact of the injury. *McDowell*, 104 Ariz. at 71, 448 P.2d at 871 "An intervening cause is an independent cause that intervenes between defendant's original negligent act or omission and the final result and is necessary in bringing about that result." *Robertson*, 163 Ariz. at 545, 789 P.2d at 1047. "Not all intervening acts are superseding causes," cautioned the court. *Id*. at 545, 789 P.2d at 1047. "A superseding cause sufficient to become the proximate cause of the final result and relieve defendant of liability for his original negligence, arises only when an intervening force was unforeseeable and may be described, with the benefit of hindsight, as extraordinary." *Id*. at 545, 789 P.2d at 1047. It would be unfair to hold a defendant liable under such "extraordinary" circumstances. *Rossell v. Volkswagen of Am.*, 147 Ariz. 160, 164, 709 P.2d 517, 521 (1985); *Gipson v. Kasey*, 496 Ariz. Adv. Rep. 41, 150 P.3d 228 (2007); *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 554, 832 P.2d 203, 207 (1992); 1-4 *Negligence in Arizona* § 4.02.

"In order to hold an actor liable for negligence, a plaintiff must prove that the plaintiff was in the foreseeable range of the negligent conduct, and that one of the dangers or risks that made the actor's conduct negligent brought about the injury." *Barrett v. Harris*, 207 Ariz. 374, 382, 86 P.3d 954, 962 (Ct. App. 2004). Determining whether a defendant's

14

conduct was a but-for cause of the plaintiff's injury is logically distinct from, and a condition precedent to, analysis of whether plaintiff was "within the foreseeable range" of her lawyer's negligent conduct.  *Id*. at 382, 86 P.3d at 962.  "Negligence," the *Barrett* court emphasized, "is not actionable in the abstract."  Although a "tortfeasor can be liable if its conduct contributed 'only a little' to the plaintiff's damages," the plaintiff must prove that the defendant's act or omission is *both* a but-for cause and a legal cause of the complained-of injury before she may recover.  *Id*. at 382, 86 P.3d at 962.

### 3. But-For Causation and Proximate Causation in Litigation Malpractice

#### i. Subversion of the But-For Causation Requirement

Cecala attempts to elide her burden of proof regarding cause in fact.  In a summary judgment posture, the record evidence must allow a fair-minded juror to reasonably infer that, but for Newman's negligence, Cecala *should* have prevailed in the NASD arbitration. *Purcell*, 18 Ariz. App. at 82, 500 P.2d at 342.  Cecala contends, in contrast, that "cause-in-fact" exits if Newman's act or omission contributed "only a little" to the plaintiff's injuries. (Doc. ## 193 at 13-14; 230 at 1; 236 at 2.)  This fundamentally misstates the law.  The "only a little" language upon which Cecala so heavily relies has no bearing on the cause-in-fact inquiry.  The quoted language means only that, *upon proof of but-for and legal causation*, a defendant may be liable for the foreseeable results of his actions even if he was not the *only* or even the *predominant* cause of that injury.

This confusion permeates Cecala's theory of her case, and the error is fatal to her.  By this confusion, she would absolve herself of the burden of showing how any reasonable trier of fact *should* have found for her in the arbitration, but for Newman's negligent acts.  Instead, she would empower a malpractice jury to find against her former attorney merely if his negligence contributed "only a little" to the arbitration loss that would have been lost anyway.  This would abolish the "but-for" causation requirement.

1

2

### ii. The Judgment Error Rule, Speculativeness, and Lack of Foreseeability

3

4

The foreseeability requirement of proximate causation is also pertinent and fatal to Cecala's case. Proximate causation is addressed only after the plaintiff establishes that she should have prevailed but for the defendant-attorney's malpractice. 1-4 *Negligence in Arizona* § 4.02. After crossing the but-for threshold, Cecala is required to show, by a preponderance of the evidence, that the litigation injury was foreseeable in the sense that the attorney-defendant should have anticipated the harm from the negligent act or omission. 1 *Legal Malpractice* § 8:5 at 984-85; *see TIG Ins. Co. v. Giffin Winning Cohen & Bodewes, P.C.*, 444 F.3d 587, 592 (7th Cir. 2006) (holding that a law firm's failure to produce documents in discovery was not the legal cause of the ensuing $1.2 million in attorney fees for discovery and sanctions).

5

6

7

8

9

10

11

12

Under the judgment error rule, malpractice liability will not attach for tactical decisions made in good faith in the course of preparing or trying a case. Injury flowing from such errors in attorney judgment is not foreseeable as a matter of law. "Good faith," explain leading commentators, "is based on an objective standard of whether the lawyer's decisions were intended to benefit the client in the representation." 4 *Legal Malpractice* § 30:8 Mallen and Smith explain the concept as follows:

13

14

15

16

17

18

> Some alleged errors that should not be the basis for legal malpractice consideration involve inherently judgmental decisions. Thus, considerations, such as *the choice of the trier of fact, selection of venue, the style of presentation*, should not support a legal malpractice claim. Although lawyers do make tactical decisions, a fundamental policy is that the result should not vary for such reasons. The standard for the case-within-a-case methodology is determining what the result "should have been," not what it "could have been . . . ."

19

20

21

22

> In hind sight, even the defendant-attorney probably would agree with the unhappy client that a different approach might have been more productive. Thus, the rule than attorney is not liable for a mere error in judgment is extremely appropriate and necessary to protect the attorney engaged in the conduct of a trial, who must continuously select between alternatives, none of which are necessarily wrong or right.

23

24

25

26

4 *Legal Malpractice* §§ 30:6 at 401; 30:40 at 601 (emphasis added).

27

The rule of no liability for good faith litigation judgments can be viewed as a lack of

28

proof of proximate causation or lack of proof of "but-for" causation. The speculativeness

16

1    is fatal under either category. *See Estate of Re by Coarsely v. Kornstein, Veisz & Wexler*,

2    958 F. Supp. 907, 921, 924 (S.D.N.Y. 1997) (Plaintiffs failed to show that there should have

3    been a different result in arbitration if the attorneys adopted the strategies urged by them.

4    "There is no evidence from which a trier of fact could infer that the same argument . . .

5    would have been dispositive if delivered with a different gloss and with greater zeal . . . . In

6    short, plaintiffs' hindsight determination that defendants were not rigorous enough or quick

7    enough in advancing the disputed position is precisely the sort of second-guessing of

8    counsel's strategic judgment that does not rise to the level of legal malpractice.") (citations

9    and internal quotations omitted).

10                    **4.    Fiduciary Breach Malpractice**

11         The same standards of actual and legal causation that govern an action for attorney

12    negligence apply with equal force in an action for fiduciary breach, which is also tried under

13    the "case-within-a-case" methodology. *Kilpatrick*, 909 P.2d at 1290-93; *Weil Gotshal &*

14    *Manges, LLP v. Fashion Boutique of Short Hills, Inc.*, 10 A.D.3d 267, 271, 780 N.Y.S.2d

15    593, 596 (N.Y. App. Div. 2004) ("We have never differentiated between the standard of

16    causation [required] for a claim of legal malpractice and one for breach of fiduciary duty in

17    the context of attorney liability.  The claims are coextensive."); *cf. Milbank, Tweed, Hadley*

18    *& McCloy v. Chan Cher Boon*, 13 F.3d 537, 543 (2d Cir. 1994) (relaxing the but-for

19    causation standard for fiduciary breach under a now discredited interpretation of New York

20    law); *see* 4 *Legal Malpractice* § 33:10 at 1073-74.

21    **V.    Cecala's Second Amended Complaint**

22         Cecala's Second Amended Complaint asserts four bases of attorney and law firm

23    liability: 1) legal malpractice, 2) breach of fiduciary duty, 3) intentional infliction of

24    emotional distress, and 4) negligent supervision.  (Doc. # 67.)

25         The first count challenges two discrete patterns of illicit conduct: 1) the mishandling

26    of Cecala's Title VII claims against NationsBank both prior to and during the NASD

27    arbitration; and 2) the sexualization of the attorney-client relationship, which in Cecala's

28    view "impaired Newman's judgment" and precluded dispassionate, objective representation.

                                        17

1    (*Id.* at 25.)  Cecala avers that these patterns of tortious conduct converged to "cause[] or

2    contribute[] to the loss of Cecala's underlying employment claims," leading to the forfeiture

3    of money and equitable damages against NationsBank, the loss of "salary and benefits

4    commensurate with her abilities and qualifications," and injury to her reputation. (*Id.* at 26.)

5    Though somewhat inartfully plead, Cecala's claim for "malpractice" sounds in negligence

6    because it targets Newman's multiple departures from the standard of care, and further

7    alleges that these patterns of misconduct proximately caused Cecala to suffer pecuniary

8    damages.  (PSOF 14, 17.)

9        Count two, in contrast, asserts malpractice liability on a theory of fiduciary breach.

10   Cecala submits that her former lawyer breached his duties of "loyalty, confidentiality, and

11   disclosure" by "becoming sexually involved"with Cecala and "failing to terminate the

12   representation in a responsible manner." (Doc. # 67 at 28.)  The gravamen of this claim is

13   that Newman willfully abused the relationship of trust and confidence that exists between an

14   attorney and his client by engaging in a pattern of "self-serving, manipulative and predatory"

15   sexual conduct with Cecala  without her effective consent.  (Doc. # 193 at 8; PSOF 5-6.)

16       Cecala avers that Newman's willful violation of his fiduciary duties negatively

17   impacted the quality of her legal representation, causing *both* economic and psychological

18   injury. "In addition to the pecuniary damages" that she suffered "as a result of the loss of her

19   monetary claims and equitable remedies against NationsBank, [D]efendant Newman's

20   conduct in sexualizing the attorney-client relationship caused further emotional,

21   psychological, and physical damage to [P]laintiff." (Doc. # 67 at 32.)

22        Cecala's causes of action for attorney negligence and breach of fiduciary duty

23   complain, in part, of the same fundamental litigation injury: the loss of her otherwise

24   meritorious claims against NationsBank.  However, Cecala's claim for breach of fiduciary

25   duty seeks relief for psychological injury in addition to litigation injury.

26   **VI.    Negligent Supervision**

27       Cecala's fourth theory of recovery, which targets Newman's law firm, need not detain

28   the court for long.  Cecala avers in her Second Amended Complaint that Cooperman Levitt

"breached its duty of supervision" as well as "applicable attorney ethical rules to exercise reasonable care in supervising Newman." (Doc. # 67 at 35.) Cecala alleges that she suffered pecuniary and psychological damages as a direct result of Cooperman Levitt's failure "to supervise [Newman] adequately." (*Id.*) This claim is plagued by numerous deficiencies.

First, Cecala has failed to offer any evidence as to the standard of care from which the firm is alleged to have deviated. While a professional corporation may be liable under New York law for the torts of its employees under a theory of respondeat superior, *Connell v. Hayden*, 83 A.D.2d 30, 443 N.Y.S.2d 383 (1981), Cecala has cited no authority in support of the proposition that Cooperman Levitt owed her an affirmative duty of supervision on the facts of this case, nor has she provided any insight as to what that duty might command.

State ethics rules do not, of course, create private rights of action for aggrieved clients. "With few exceptions, the courts agree that the violation of an ethics rule alone does not create a cause of action, constitute legal malpractice *per se* or necessarily create a duty." 2 *Legal Malpractice* § 19:7 at 1208. The Arizona Supreme Court expressly aligned itself with this majority view when it "declined to use the court's own ethical standards as a basis upon which to impose legal malpractice liability." *Stanley v. McCarver*, 208 Ariz. 219, 225 n.6 92 P.3d 849, 855 n.6 (2004) (citing Ariz. R. Sup. Ct. 42, R. Prof. Resp., Preamble, Scope ¶ 20 (noting that rules of professional responsibility "are not designed to be a basis for civil liability")); *Elliott v. Videan*, 164 Ariz. 113, 116, 791 P.2d 639, 642 (Ct. App. 1989) (discussing jury instructions).

Cecala attempts to support her theory of negligent supervision with the affidavit of her legal ethics expert, Professor Geoffrey C. Hazard, Jr. (PSOF Ex. 11.) Professor Hazard opines that Cooperman Levitt failed to supervise Newman or take remedial action against Newman in violation of a legal duty. But his opinion is wholly speculative. First, Professor Hazard assumes that Cooperman Levitt's failure to adhere to a New York Disciplinary Rule is actionable negligence. (*Id.* Ex. 11 at 7.) *Stanley* is directly to the contrary. Second, taking "the facts alleged by [Cecala] concerning sexual relations between her and [Newman] . . . as true" Professor Hazard simply "assumes" that "one or more of" Newman's law partners

19

1  knew or reasonably should have known of the sexual relationship between Newman and

2  Cecala.  (*Id*. Ex. 11 at 2, 7.)   There is no factual or evidentiary foundation for this

3  assumption.  (*Id*. Ex. 11 at 2.)

4         Finally, even assuming that Cooperman Levitt did owe some "duty of supervision"

5  to its client, Cecala has failed to adduce any evidence tending to show that, but for the breach

6  of that legal duty, the firm would have detected and would have stopped the inappropriate

7  relationship between Newman and his client.  Professor Hazard cannot manufacture a

8  genuine issue of fact by assuming facts without evidence and liability without law.  (*Id*. Ex.

9  11 at 8.)

10        Summary judgment will be granted against Cecala's claim for negligent supervision

11 for failure "to establish the existence of an element essential to [her] case, and on which

12 [Cecala] will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

13 **VII.   Statute of Limitations**

14        Section 12-542, Arizona Revised Statutes, prescribes a two-year limitations period

15 "for injuries done to the person of another including causes of action for . . . malpractice."

16 "The determination of when a cause of action accrues on a claim for legal malpractice is

17 governed by the discovery rule."  *Commercial Union*, 183 Ariz. at 254, 902 P.2d at 1358.

18 Under that rule, the statute of limitations does not begin to run until a plaintiff has actual or

19 constructive knowledge that she has suffered an "actionable wrong," defined as a "tort that

20 results in appreciable non-speculative harm."  *Manterola v. Farmers Ins. Exch.*, 200 Ariz.

21 572, 576, 30 P.3d 639, 643 (Ct. App. 2001) (citations and internal quotations omitted).

22 "Commencement of the statute of limitations will not be put off until one learns the full

23 extent of his damages.  Rather, the statute commences to run when the plaintiff incurs some

24 injury or damaging effect from the malpractice."  *Commercial Union*, 183 Ariz. at 255, 902

25 P.2d at 1359.

26        The parties agree that Cecala's three remaining theories of recovery are subject to this

27 two-year limitations period.  (Doc. # 171 at 9.)  Newman urges the court to dismiss "all

28 claims, however denominated," for failure to comply with A.R.S. § 12-542.  (*Id*. at 7.)

1    However, Cecala's litigation malpractice claims were timely filed pursuant to an exception

2    to that limitations period.  The claims for intentional infliction of emotional distress and for

3    psychological injury from breach of fiduciary duty are entitled to no such exception, and

4    therefore are out-of-time.

5          **A.      The *Amfac* Cases: Errors in Litigation**

6          In the litigation context, "the injury or damaging effect on the unsuccessful party [in

7    an action for litigation legal malpractice] is not ascertainable until the appellate process is

8    completed or is waived by failure to appeal."  *Amfac Distrib. Corp. v. Miller*, 138 Ariz. 152,

9    153-54, 673 P.2d 792, 794 (1983) ("*Amfac I*"); *Amfac Distrib. Corp. v. Miller*, 138 Ariz. 155,

10   157, 673 P.2d 795, 797 (Ct. App. 1983) ("*Amfac II*") ("it is only when the litigation is

11   terminated and the client's rights are 'fixed' that it can safely be said that the lawyer's

12   misdeeds resulted in injury to the client").  Because "apparent damage may vanish with

13   successful prosecution of an appeal and ultimate vindication of the attorney's conduct by an

14   appellate court," and in order to "preserve the essential element of trust in the attorney-client

15   relationship," a cause of action for malpractice in the litigation context does not accrue until

16   judicial review is exhausted or waived.  *Amfac II*, 138 Ariz. at 796, 799, 673 P.2d at 796,

17   799; *see Glaze v. Larsen*, 207 Ariz. 26, 83 P.3d 26 (2004) (articulating the practical and

18   policy rationales for the "errors-in-litigation" rule of accrual).

19         In its October 11, 2005 Order, the court held *Amfac I* and its progeny applicable to

20   malpractice in arbitration, stating that "accrual of a legal malpractice claim arising in

21   arbitration begins when the judicial review of the arbitration award is concluded and the

22   appellate process is completed or is waived by a failure to appeal."  (Doc. # 65 at 9.)

23   Although Newman's allegedly negligent representation was complete on or around June 21,

24   1999, the date he was formally discharged by Cecala, the statute of limitations did not begin

25   to run as to his departures from the standard of care until November 21, 2002, when Cecala

26   abandoned further judicial review of the adverse arbitral award.  (*Id*. at 2.)  Thus, Cecala's

27   count of attorney negligence was timely filed on November 21, 2004.

28

1   Cecala's fiduciary breach claim, having been filed in November 2004, is untimely

2   under A.R.S. § 12-542 unless it is sheltered by the *Amfac* cases or some other exception to

3   the two-year limitations period. Though it is a novel question, the court also finds that, to the

4   extent it claims injury to her case against NationsBank, Cecala's claim for fiduciary breach

5   was timely filed under *Amfac I* and its progeny.  As explained in the court's prior Order, the

6   *Amfac* cases delay the accrual of a cause of action for malpractice when the tangible injury

7   upon which that claim is founded could "vanish with successful prosecution of an appeal."

8   *Amfac II*, 138 Ariz. at 796, 799, 673 P.2d at 796, 799.  The litigation-injury component of

9   Cecala's claim for fiduciary breach is predicated upon the adverse decision of the arbitral

10  tribunal. Setting aside that award would likely have cured that injury.

11          **B.    *Amfac* Does Not Apply to Non-Litigation Injury**

12          Cecala alleges that Newman's "outrageous" sexual conduct began on August 1998,

13  and continued until June 1999.  (Doc. # 193 at 9.)  Assaying the facts in the light most

14  favorable to her, Cecala's claim for intentional infliction of emotional distress accrued, at the

15  latest, on June 21, 1999, when she discharged her lawyer and ended their sexual relationship.

16  *See Floyd v. Donahue*, 186 Ariz. 409, 413, 923 P.2d 875, 879 (Ct. App.1996) (discussing the

17  doctrine of "continuing torts").  Therefore, absent an exception to A.R.S. § 12-542, Cecala's

18  claim for intentional infliction of emotional distress was out-of-time by three years and five

19  months when filed on November 21, 2004.

20          Cecala first contends that her intentional tort claim should be sheltered under *Amfac*

21  *I* and its progeny because "Mr. Newman's outrageous conduct cannot be separated from its

22  adverse consequences that constitute malpractice."  (Doc. # 193 at 9.)  Cecala has marshaled

23  no authority for the proposition that the special rule for "errors in litigation" has any

24  application to any tort where the injury is fixed when the tort is committed.  No policy

25  interest would be furthered by permitting a plaintiff to sleep on her rights when her attorney

26  causes injury to her personhood rather than to her right to competent representation.  Mindful

27  of this, the reported decisions make clear that *Amfac I* and its progeny do not apply where,

28  as here, the injury occurs contemporaneously with the malpractice, but the injury cannot be

22

1   corrected by the successful prosecution of an appeal.  *Commercial Union*, 183 Ariz. at 256,
2   902 P.2d at 1360 (citation omitted).  Because it did not "arise in arbitration" within the
3   meaning of the court's prior Order, Cecala's claim for intentional infliction of emotional
4   distress accrued no later than June 21, 1999.  (Doc. # 65 at 9.)

5       Cecala's fiduciary breach damages that stand free of her litigation injury, such as
6   emotional suffering from Newman's "predatory," quid pro quo sexualization of the attorney-
7   client relationship, also were fixed on June 21, 1999, the date she discharged Newman.
8   Therefore, the accrual of that injury was on June 21, 1999, and was not delayed by *Amfac I*
9   and its progeny.

10      **C.    "Unsound Mind" Tolling Does Not Apply**

11      Cecala submits that her non-litigation claims are tolled by A.R.S. § 12-502, which
12   provides, "If a person entitled to bring an action . . . is at the time the cause of action accrues
13   . . . of unsound mind, the period of such disability shall not be deemed a portion of the period
14   limited for commencement of the action."  "The statutory provision for tolling is premised
15   on equitable principles similar to those that underlie the discovery rule: it is unfair to bar an
16   action in which the plaintiff is mentally disabled and thus unable to appreciate *or* pursue his
17   or her legal rights."  *Doe v. Roe*, 191 Ariz. 313, 325, 955 P.2d 951, 963 (1998) (emphasis in
18   original).  A litigant need not be institutionalized nor be adjudged legally incompetent to
19   qualify for tolling under A.R.S. § 12-502.  *Kiley v. Jennings, Strouss & Salmon*, 187 Ariz.
20   136, 141, 927 P.2d 796, 801 (Ct. App. 1996).

21      Cecala concedes that her claim for intentional infliction of emotional distress accrued
22   on June 21, 1999, at the latest, five years and five months before filing this action.  (Doc. #
23   193 at 11.)

24      **1.    The Meaning of "Unsound Mind"**

25      Section 12-502, Arizona Revised Statutes, does not supply a definition for the term
26   "unsound mind," so the courts have filled the gap.  The leading cases are *Doe* and *Florez v.*
27   *Gomez*, 185 Ariz. 521, 917 P.2d 250 (1996).  A person is of unsound mind when he is
28   "unable to manage his daily affairs or to understand his legal rights or liabilities."  *Doe*, 191

1   Ariz. at 326, 955 P.2d at 964  (citation and internal quotations omitted).  The definition is

2   disjunctive: "Facts permitting . . . Cecala is entitled to have the jury consider both

3   alternatives." *Id* at 328, 955 P.2d at 966.

4        The plaintiffs in *Florez* and *Doe* alleged that they had suffered sexual abuse during

5   childhood and adolescence and, as a result of the enduring psychological ramifications of

6   those injuries, remained fundamentally unaware of their right to sue, both at and after the

7   time their claims accrued.  *Flores*, 185 Ariz. at 521, 917 P.2d at 250; *Doe*, 191 Ariz. at 330,

8   955 P.2d at 968.  The *Doe* court explained, "One who recalls . . . repressed memories may

9   not be able to connect the images in a fashion sufficiently coherent to allow an understanding

10  of the incident or the resulting injury.  Such a person may not be able to articulate events so

11  as to pursue her rights."  *Id*. at 320, 955 P.2d at 958.

12       However, in light of the countervailing policies implicated by the suspension of the

13  limitations period, the Arizona Supreme Court held in *Florez*, as in *Doe*, that to defeat

14  summary judgment a plaintiff must muster "hard evidence" to create a genuine issue of

15  material fact as to her inability to appreciate or pursue her legal rights.  In most cases, "the

16  best guide to whether somebody can understand and pursue his legal rights is how that person

17  behaves, not what that person says he or she cannot do."  *Doe*, 191 Ariz. at 332, 955 P.2d at

18  970 (Martone, J., concurring).

19              **2.    Quantum of Evidence to Defeat Summary Judgment**

20        "In the context of determining unsound mind as evidenced by an inability to manage

21  daily affairs, the question [on a defense motion for summary judgment] is whether there is

22  *credible evidence* of the plaintiff's *inability* to manage daily affairs."  *Doe*, 191 Ariz. at 327,

23  955 P.2d at 965 (emphasis in original).  "The plaintiff is not required to discredit all evidence

24  of ability to manage her affairs–such controverting evidence merely establishes that there is

25  a jury question on an issue of material fact."  *Id*. at 328, 955 P.2d at 965.  "It is not [for the

26  trial court] to weigh conflicting evidence to determine whether the plaintiff was capable of

27  functioning on a day-to-day basis.  That role would encroach upon the jury's function."  *Id*.

28  at 328, 955 P.2d at 965.  The same is true for the second prong of the test for unsound mind,

1    where the burden is on the plaintiff to create a genuine issue of material fact as to her

2    inability to understand and assert legal rights. *Id.* at 329, 955 P.2d at 967.

3         "If there is hard evidence that a person is simply incapable of carrying on the day-to-

4    day affairs of human existence, then the statute is tolled.  Otherwise it is not.  These are

5    empirical facts easily verifiable and . . . difficult to fabricate." *Florez*, 185 Ariz. at 521, 917

6    P.2d at 255.  "The purpose of the statute of limitations is to protect defendants and courts

7    from stale [and fraudulent] claims where plaintiffs have slept on their rights." *Doe*, 191 Ariz.

8    at 322, 955 P.2d at 960 (citation and internal quotations omitted).  This "policy cannot be

9    overcome by conclusory averments such as assertions that one was unable to manage daily

10   affairs or understand legal rights and liabilities.  The plaintiff instead must set forth specific

11   facts–hard evidence–supporting the conclusion of unsound mind." *Id.* at 326, 955 P.2d at

12   964; *Florez*, 185 Ariz. at 526, 917 P.2d at 255.  These statements from the Arizona Supreme

13   Court, though couched in terms of Arizona procedure, apply with equal force in the context

14   of a Fed. R. Civ. P. 56(c) motion.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730,

15   738 (9th Cir. 1979) (conclusory and speculative testimony in affidavits and moving papers

16   is insufficient to raise genuine issues of fact and to defeat summary judgment).

17        *Florez* and *Doe* illustrate what is insufficient and what is sufficient to defeat summary

18   judgment on the issue of unsound mind, respectively.  The plaintiffs in *Florez* were an adult

19   male and an adult female who accused a priest and a male parent of sexually molesting them

20   during childhood. They were capable of  maintaining employment, taking care of financial

21   affairs, attending school part-time, and working full-time. *Florez*, 185 Ariz. at 526, 917 P.2d

22   at 255.  Their experts opined that the plaintiffs suffered disabling psychological disorders,

23   depression, and post-traumatic stress disorder.  These diagnoses provided the sole bases for

24   the experts' "unsound mind" conclusions.

25        The court held the experts' opinions insufficient to survive summary judgment.  In

26   one case, the expert opined that a plaintiff was of "unsound mind" because he "suffered from

27   depression and stress," among other emotional maladies.  *Id.* at 527, 917 P.2d at 256.  The

28   court said, "If these facts, and others listed in [plaintiff's expert's] affidavit, were sufficient

25

to support a legal finding of 'unsound mind,' then all those who have less than satisfactory lives would be of 'unsound mind.'" *Id.* at 527, 917 P.2d at 256.  Although the affidavits "may [have] created a scintilla of doubt," they were insufficient to create a triable issue of material fact in light of the uncontradicted evidence of the plaintiffs' ability to manage their day-to-day affairs.  *Id.* at 527, 917 P.2d at 256.  The motion for summary judgment was granted because of the absence of facts–hard evidence– to support their claim.

In *Doe*, the plaintiff accused her father of sexually abusing her during her childhood. Summary judgment was denied because the plaintiff provided factual substantiation of her disability for the entirety of the period of unsound mind.  The experts averred that recollection of the plaintiff's sexual abuse rendered her incapable of performing her duties at a brokerage firm.  She was unable to seek employment after voluntarily resigning from her job, she had suicidal ideation, was in denial of the abuse she suffered, and required both psychological and psychiatric therapy and treatment, as well as institutionalization for her mental condition.  *Id.* at 327, 955 P.2d at 965.

As to the second prong of the disability standard, plaintiff adduced evidence that she repressed her memories of abuse, was in denial that any abuse took place, was unable to accept that the events had occurred, was unable to articulate them, experienced feelings of complicity with her abuser, and experienced feelings of responsibility and guilt for the abuse. *Id.* at 329, 955 P.2d at 967.  The expert affidavits, being grounded in facts, were "more than sufficient to raise a genuine issue of material fact on whether [the plaintiff] was unable to carry on the day-to-day affairs of life."  *Id.* at 328, 955 P.2d at 966.

"[T]here [were] facts in the record that detract[ed] from [the plaintiff's] claim of inability to manage daily affairs," however.  *Id.* at 328, 955 P.2d at 966.  Although "those findings would preclude summary judgment in favor of [p]laintiff if she moved for summary judgment on the unsound mind issue," they did not require the opposite conclusion.  *Id.* at 328, 955 P.2d at 966.

26

1
### 3.       Insufficient Evidence of Inability to Understand Legal Rights

2      Cecala has repeatedly and conclusively demonstrated not only that she was *aware* of

3   her intentional tort claim as of June 21, 1999, the date she discharged lawyer Newman, but

4   also that she was able to "articulate events so as to *pursue* her rights," both as to the

5   arbitration with NationsBank and as to her claims against Newman, from the date of accrual

6   to the present day. *Doe*, 191 Ariz. at 320, 955 P.2d at 958 (emphasis added). In her February

7   27, 2007 Declaration, submitted in connection with her Motion to Disqualify Newman's'

8   standard of care expert (Doc. # 182 Ex. B), Cecala describes–and documents–her multiple

9   attempts during the claimed period of "unsound mind" to retain counsel for (1) the NASD

10  arbitration, (2) the motion to vacate the adverse award, (3) the appeal of the denial of that

11  motion, and (4) her malpractice claims against Newman.

12      On July 21, 1999, just one month after her intentional infliction of emotional distress

13  and fiduciary breach claims accrued, Cecala used the Martindale-Hubbell lawyer locator

14  service to search for North Carolina counsel in the area of employment law.  (*Id*. Ex. B.

15  Attach. 3.)   Having selected the North Carolina law firm of Ferguson Stein, Cecala

16  telephoned John W. Gresham, a member of that firm, to discuss her claims against

17  NationsBank. (*Id*. Ex. B. at 2.) Cecala discloses that "the general topic of my conversation

18  was [Ferguson Stein's] taking over my representation in the NationsBank arbitration." (*Id*.

19  Ex. B at 2.)  She further avers that "[w]e talked about my case, my claims, and my need of

20  representation.  After hearing about the case, and its procedural status, the firm declined to

21  take over the case." (*Id*. Ex. B. at 2.) Cecala's recollection of subsequent conversations with

22  Ferguson Stein attorneys demonstrates a similar, if not greater, ability to articulate and pursue

23  her legal rights throughout the claimed period of unsound mind.  The declarations from

24  Cecala's friends and family, discussed in further detail below, also illustrate Cecala's ability

25  to perform independent legal research on her employment and malpractice claims. (PSOF Ex.

26  23 at 6; Ex. 25 at 3-4.)  Cecala's ability not only to recognize but also to assert her legal

27  rights during the claimed period of disability is further illustrated by the arbitration transcript

28

1  from the two sessions in October 1999 where, having failed to retain new trial counsel, she

2  prosecuted her claims on her own. (*Id*. Ex. 28; Doc. # 246.)

3      Nevertheless, Cecala asserts that "she did not have the mental, emotional, or physical

4  ability to assert her legal rights, including bringing this action in a timely manner." (PSOF

5  25.)  This bare conclusion cannot stand in light of Cecala's own detailed admission of her

6  ability to both understand and pursue her legal rights.  Whether Cecala was ultimately

7  successful in persuading the arbitrators to rule in her favor, in overturning the adverse award

8  in the federal courts, or in bringing suit against Newman in the Maricopa Superior Court, is

9  irrelevant.  The focus of the unsound mind inquiry is on cognition, not competency.  *Doe*,

10  191 Ariz. at 332, 955 P.2d at 970 (Martone, J., concurring).

11      Unlike the plaintiff in *Doe*, Cecala has not adduced evidence to create a genuine issue

12  of material fact as to her inability to understand her legal rights against NationsBank or

13  lawyer Newman.  She has submitted no hard evidence of denial or inability to articulate the

14  wrongs perpetrated by Newman, feelings of complicity with her abuser, or feelings of guilt

15  for the abuse that would show that she did not understand that a wrong had occurred.  *Id.* at

16  329, 955 P.2d at 967.  Quite the opposite.  The uncontroverted evidence adduced by Cecala

17  demonstrates not only recognition of her legal rights, but the pursuit of those rights

18  throughout the claimed period of disability.

19          **4.    Insufficient Evidence of Inability to Manage Daily Affairs**

20      Cecala's relationship with Newman caused her profound physical and psychological

21  suffering.  The declarations of her family and friends, in particular, present a picture of her

22  emotional instability and mental anguish.  The declaration of Cecala's father, Don Cecala,

23  is illustrative:

24      For over two years, the roller coaster of emotions and healing appeared to be headed
    nowhere.  One minute there were flashbacks to the healthy, happy daughter we once
25      had, followed by anxiety episodes, or emptiness, or lifelessness, somewhere in
    between.  I endeavored to use the financial dependency as a tool to help with repair.
26      I experimented frequently with the assignment of responsibility in financial detail,
    such as bill preparation and paying.  It sometimes worked but usually didn't.  The
27      inconsistency of Renee's personality and capability defied belief.  She would be
    brilliant one minute, and anxiety stricken the next . . . . Tasks could be accomplished
28      individually and they would appear to reflect the total pattern, but they did not.

28

1    (PSOF Ex. 23 at 11-12.)  That Cecala often needed assistance from her friends and family

2    is insufficient to support a claim of unsound mind where, as here, the uncontroverted

3    evidence shows that Cecala was not only able to care for herself at least *some* of the time, but

4    that she also had the higher degree of mental ability required to research and pursue her legal

5    rights in the underlying case against NationsBank and against attorney Newman for the

6    entirety of the claimed period of functional disability. Cecala has failed to carry her burden

7    to create a triable issue of material fact as to whether she was "simply incapable of carrying

8    on the day-to-day affairs of human existence" from June 21, 1999, through at least November

9    21, 2002.  *Florez*, 185 Ariz. at 526, 917 P.2d at 255.

10                            **i.    Expert Affidavits**

11        The court will examine the opinions of the experts who, in Cecala's view, tell "the real

12    story" of her legal disability.  (Doc. # 193 at 10 n.5.)

13                               **a.    Dr. Rutter**

14        The first such expert is Dr. Peter Rutter, M.D., a psychiatrist who specializes in the

15    study of "sexual exploitation by attorneys . . . holding a position of trust to act in the best

16    interests of those they were serving." (PSOF Ex. 9 at 3.)  Although he interviewed Cecala

17    to familiarize himself with the facts of this case, Dr. Rutter is not Cecala's treating

18    psychiatrist, and his  opinion is therefore limited to the record now before the court.  (*Id*. Ex.

19    9 at 2.)  In his affidavit and deposition testimony, Dr. Rutter describes a phenomenon known

20    as "transference," whereby the receiver of professional services, such as Cecala, has an

21    expectation of being able to trust the provider of those services, Defendant Newman in this

22    case, to act in her best interests.  (*Id*. Ex. 9 at 4; Ex. 10 at 12.)

23        "Under such conditions, the receiver of services is known and expected to have certain

24    psychological dependency needs and foreseeable vulnerabilities . . . that restrict independent

25    and informed judgment regarding both the professional and personal behavior of the

26    professional." ( *Id*. Ex. 9 at 4.) When that relationship of trust is exploited, as Cecala alleges

27    here, "there is a deeper and more pervasive level of injury that sets up in the injured

28    individual a condition in which they now often fear, rather than trust, the very professional

1   they must rely on to help them with their vulnerability." (*Id*. Ex. 9 at 4.)  This is the

2   foundation for Dr. Rutter's opinion that Cecala suffered "long-lasting and severe" damages

3   from the sexualization of the attorney-client relationship, to which she did not effectively

4   consent.  (*Id*. Ex. 9 at 5.)  He opined further that "[d]epression and post-traumatic injuries"

5   inured, "resulting in extremes both in terms of emotional suffering and loss of previous

6   functional capacity in work, socialization and personal relationships." (*Id*. Ex. 9 at 5.)

7       Dr. Rutter's opinion does not create a triable issue as to whether Cecala was

8   "incapable of carrying on the day-to-day affairs of human existence" from June 21, 1998,

9   through at least November 21, 2002. *Doe*, 191 Ariz. at 328, 955 P.2d at 964. He asserts bare

10   medical conclusions without support in the "specific facts" or pertinent time periods. *Florez*,

11   185 Ariz. at 526, 917 P.2d at 255.  His opinion as to Cecala's "long-lasting and severe"

12   psychological injury is totally devoid of supporting  "hard evidence," and therefore does not

13   satisfy the threshold standard articulated in both *Florez* and *Doe*.  *Id.*, 185 Ariz. at 521, 917

14   P.2d at 255.

15       Furthermore, *Flores* expressly held that a diagnosis of post-traumatic stress disorder

16   is not sufficient to toll under A.R.S. § 12-502.  185 Ariz. at 526, 917 P.2d at 255.  Dr.

17   Rutter's affidavit and deposition testimony do not, whether standing alone or taken together

18   with the balance of Cecala's evidence, create a triable issue of material fact ast to Cecala's

19   inability to manage the day-to-day affairs of human existence.

20             **b.**    **Dr. Harrison**

21       Cecala next directs the court's attention to the affidavit of Sheryl W. Harrison, Ph.D.,

22   a psychologist who treated Cecala for "major depression" on an "irregular basis" from

23   February 15, 1999, until February 17, 2000.  (PSOF Ex. 22 at 1.)  She also "saw Renee a few

24   times in 2003," and began seeing her "regularly" in 2005.  (*Id*. Ex. 22 at 1.)  During that

25   period, Dr. Harrison referred Cecala to a psychiatrist, Dr. Stonnington, "so that Renee could

26   obtain the benefit of psychological counseling from [Dr. Harrison] and medications from Dr.

27   Stonnington." (*Id*. Ex. 22 at 2.)  Dr. Harrison believes that she would have seen Cecala more

28   often if, while living in Arizona, Cecala had been able to leave her home.  (*Id*. Ex. 22 at 1.)

1    In her affidavit, Dr. Harrison expresses a variety of medical conclusions. The

2  affidavit does not, however, include "specific facts" or any other "hard evidence" of Cecala's

3  functional incapacity. For example, Dr. Harrison opines, without reference to facts, that

4  between February 1999 and February 2000, she observed that Cecala displayed and

5  expressed "suicidal ideation." (*Id.* Ex. 22 at 2.) Dr. Harrison also expresses the view that

6  Cecala "was unable . . . to maintain any type of employment," "unable to care for herself

7  adequately," "[unable] to maintain basic hygiene," and "[unable] to make decisions about

8  things as simple as what to wear." (*Id.* Ex. 22 at 2.) This is the only foundation for Dr.

9  Harrison's conclusion that Cecala "lacked the ability to pursue her legal rights." (*Id.* Ex. 22

10  at 2.) The affidavit fails to defeat Newman's Motion under Arizona substantive and federal

11  procedural law.

12    Furthermore, Dr. Harrison's observations are limited to the one-year period of

13  treatment between February 1999 and February 2000. Even if her conclusory averments did

14  create a genuine issue of material fact as to Cecala's inability to manage her daily affairs

15  during that one-year period, they fail to create a triable issue as to the balance of the

16  disability period.

17                      **c.    Dr. Wilson**

18    C. Brady Wilson, Ph.D., assessed Cecala's psychological status in light of the

19  litigation record, a psychological examination, one face-to-face interview on November 29,

20  2006, and two telephonic interviews on December 11, 2006, and December 13, 2006. (PSOF

21  Ex. 30 at 3.) This is the foundation for Dr. Wilson's conclusion that Cecala suffers various

22  cognitive impairments and that this condition "deteriorated most significantly" between 1999

23  and 2003. (*Id.* Ex. 30 at 14.) He conclusorily avers, without recitation of the supporting

24  facts, that "the degree of [this] impairment establishes that she was 'not of sound mind'

25  during the operative period." (*Id.* Ex. 30 at 14.) This unsubstantiated conclusion is

26  insufficient to create a genuine issue of material fact as to Cecala's inability to manage the

27  day-to-day affairs of human existence as to that period of time.

28

31

1

### ii.    Declarations of Family and Friends

2      Cecala's father, mother, brother, sister, first cousin, and close friend have submitted
3  declarations in support of Cecala's claim of unsound mind. (*Id*. Ex. 23; 24; 25; 17; 27; 26.)
4  These poignant declarations show that Cecala was deeply troubled from June 1999, through
5  November 2002, and that her mental health did not begin to improve until 2003. However,
6  the declarations, whether standing alone or read in conjunction with Cecala's expert's
7  affidavits, fail to create a triable issue of material fact as to whether Cecala was "simply
8  incapable of carrying on the day-to-day affairs of human existence" from June 21, 1999,
9  through at least November 21, 2002. *Florez*, 185 Ariz. at 526, 917 P.2d at 255. The
10  proffered evidence of unsound mind shows, at most, that Cecala suffered from depression
11  and post-traumatic stress disorder during the operative period, and that Cecala's fragile
12  psychological state often made it difficult, but not impossible, for her to perform some of the
13  every-day tasks of human existence. The declarations do not create a genuine issue of
14  material fact as to Cecala's total *inability* to perform those tasks throughout the operative
15  three year and five month period. In reviewing these declarations, the court does not
16  consider testimony lacking in foundation as to the date of the conduct.

17

### a.    1999

18      Having discharged her lawyer, Cecala herself declared that she actively pursued new
19  representation from Ferguson Stein in July 1999, where she "talked about my case, and my
20  need of representation." (Doc. 182 Ex. B at 1.) Cecala did not succeed in retaining new
21  counsel, and she began to prepare the case on her own. (PSOF Ex. 23 at 6) ("There was a
22  sea of yellow note paper. I recall being sick with worry that Renee was having to do or least
23  trying to do so much for her case.") As a threshold matter, Cecala's testimony fails to create
24  a triable issue as to whether Cecala was unable to perform day-to-day activities at the time
25  that her intentional tort and non-litigation fiduciary breach claims accrued in June 1999.

26      In August 1999, Cecala telephoned her brother, Randal Cecala, in an effort to explain
27  the traumatic events of the past year. (*Id*. Ex. 25 at 3.) Randal Cecala decided to travel to
28  Phoenix to comfort his sister at that time. He "found the house she had been living in littered

1  with stacks of papers and books," relating to Cecala's pro se representation before the arbitral

2  tribunal, and he was "shocked at how she looked."  (*Id*. Ex. 25 at 3.)  He  decided to ask

3  Cecala to move in with him and his wife, Christine Cecala, in St. George, Utah.  Randal

4  Cecala helped Cecala to pack her things, and Cecala "seemed to fade in and out."  (*Id*. Ex.

5  25 at 4.)  Although she "seemed tired and weak," Cecala was able to  assist with the packing

6  and the moving process.  (*Id*. Ex. 27 at 4.)

7      Cecala suffered psychologically while living at his brother's Utah home in 1999; she

8  had nightmares and battled depression.  (*Id*. Ex. 25 at 4.)  However, it is also undisputed that

9  Cecala was able to perform basic legal research relating to her underlying employment claim

10 against NationsBank during that time.  (*E.g.*, *Id*. Ex 25 at 4 ("when she had energy to work,

11 it was usually at night when everyone else had left the building")).)  Having failed to retain

12 counsel, Cecala went on to prepare for the final arbitration hearing scheduled for October

13 1999 on her own.  With the assistance of her father, Don Cecala, and her brother Randal,

14 Cecala was also able to write checks and exercise some control over her financial affairs.

15 (DSOF 171; Ex. 17.)  She was also able, by her own admission, to go shopping for basic

16 necessities at Wal-Mart on her own, schedule and keep  appointments for personal grooming,

17 and purchase airplane reservations for travel to Phoenix for medical appointments.  (*Id*. 171-

18 72; PSOF Ex. 23 at 9.)  Cecala was not able to work at this time.

19                            **b.    2000**

20      In late 1999 to January 2000, after conducting legal research on the subject, Cecala

21 decided to investigate the possibility of suing Newman for malpractice.  (DSOF 163.)  As

22 evidenced by her personal notes, Cecala also called Ferguson Stein around that time to

23 discuss "avoiding any decision of the arbitrators" in the underlying employment dispute

24 against NationsBank.  (Doc. # 182 Ex. B at 1.)  She directed her friends and family to copy

25 exhibits for that purpose.  (PSOF Ex. 27 at 5.)  Cecala's mental condition appears to have

26 been improving at this time.  (*Id*. Ex. 25 at 5.)

27      The February 10, 2000 decision of the NASD tribunal caused Cecala to slip "back into

28 isolation" and depression.  (*Id*. Ex. 25 at 5.)  She "went through periods where sometimes she

1    would spend days in the office," in a futile effort to vacate the adverse decision.  (*Id*. Ex. 25

2    at 5.)  After making multiple telephone calls, Cecala was able to obtain some limited legal

3    advice from attorney Mickey Abraham, who subsequently represented Cecala at the Court

4    of Appeals for the Fourth Circuit.  (Doc. # 182 Ex. B at 2.)     Cecala moved in with her

5    father and mother in the fall of 2000, where, although able to "visit with family and a few

6    select friends," she "would otherwise keep to herself with minimal social contact."  (PSOF

7    Ex. 25 at 6.)  Her father avers that "she was unable to care for herself without a lot of help"

8    at this time.  (*Id*. Ex. 23 at 10.)

9                              **c.     2001**

10    Cecala traveled from Utah to Phoenix for appointments with her psychiatrist

11    throughout 2001.  (*Id*. Ex. 27 at 5.)  She also applied for Social Security with the assistance

12    of her family.  (DSOF 194.)  Around April 2001, "Renee suffered a major setback when [the

13    district] [c]ourt ruled against her in an attempt to try to overturn the arbitration award.

14    (PSOF Ex. 25 at 6.)  Cecala had represented herself before the federal district court.

15    Although her depression deepened, Cecala admits that she continued to independently

16    perform basic tasks outside her parents' home, such as shopping, throughout 2001.  (DSOF

17    187.)

18                              **d.     2002**

19    Cecala "again contacted [Ferguson Stein] in early 2002, to discuss representation in

20    pursuing Mr. Newman for malpractice."  (Doc. # 182 Ex. B at 2.)  Cecala also retained

21    Mickey Abraham to represent her on appeal of the district court's decision upholding the

22    arbitral award.  (*Id*. Ex. B at 2.)  The July 12, 2002 decision of the Court of Appeals for the

23    Fourth Circuit sent Cecala into yet another period of "extreme depression."  (PSOF Ex. 25

24    at 8.)  Yet even while despairing of the most recent of her multiple litigation losses, the

25    undisputed evidence shows that Cecala remained capable of independent action. Cecala went

26    on vacation with her friend Maureen Tatum, during which time she remained quiet and

27    reserved but otherwise was able to take care of herself.  (*Id*. Ex. 27 at 6.)  In late 2002, she

28    began drafting a  complaint against Newman and his law firm for malpractice, which she

1    filed pro se on April 18, 2003. (Doc. # 171 at 11.)  Cecala moved from Utah back to the

2    Phoenix area with her parents at the end of 2002. (PSOF Ex. 23 at 12.)

3                         **iii.    Rule 56(c) Declarations**

4         The court heard oral argument on Newman's Motion on March 28, 2007.  After the

5    close of business on March 27, 2007, on the eve of that hearing, Cecala submitted six new

6    declarations in opposition to Newman's Motion for Summary Judgment. (Doc. # 224.)  The

7    declarations of Cecala and her friend Diann Draeger were offered in support of Cecala's

8    unsound mind claim. (*Id.* Ex. 1-2.)  Cecala contends that her declarations were justified by

9    Fed. R. Civ. P. 56(c), which provides in relevant part, "The adverse party prior to the day of

10   hearing may serve opposing affidavits."  Newman objected to the admissibility of Cecala's

11   declaration, but did not challenge any of the other submissions. (Doc. # 227 at 2.)

12        The authority marshaled by Newman against and Cecala in support of the challenged

13   declaration is inapposite. (Doc. ## 227 at 2; 224 at 1; 238 at 3-4.)  *Radobenko v. Automated*

14   *Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975), and *Kennedy v. Allied Mut. Ins. Co.*, 952

15   F.2d 262 (9th Cir. 1991), were predicated upon district court factual determinations that the

16   non-moving parties were attempting to fabricate material issues of fact by resort to a "sham"

17   affidavit contradicting their own deposition testimony.  Cecala does no such thing. *Provenz*

18   *v. Miller*, 102 F.3d 1478 (9th Cir. 1996), deals with  new evidence presented by the *movant*

19   in a *reply* to a motion for summary judgment.  That case is of little moment here.

20        Cecala's March 27, 2007 declaration was untimely under LRCiv 56.1(d), a local rule

21   setting time limits for filing an opposition to summary judgment.  Neither Newman nor the

22   court had an opportunity to read Cecala's declaration before the commencement of oral

23   argument on the morning of March 28, 2007.  This is the evil to which LRCiv 56.1(d) is

24   directed.  Newman could have objected to the Cecala declaration on this ground. *Marshall*

25   *v. Gates*, 44 F.3d 722, 725 (9th Cir. 1995) (Rule 56(c) "does not unconditionally require a

26   district court to accept affidavits up to the date set for hearing on the motion for summary

27   judgment" where a valid local rule "places a condition on that right."); *Transamercia Corp.*

28   *v. Transamerica Bancgrowth Corp.*, 627 F.2d 963, 966 (9th Cir. 1980) (enforcement of local

1    rules subject to review for abuse of discretion only).  Having failed to do so, Cecala's Rule

2    56(c) declaration will be admitted into evidence.

3         However, neither unsound mind declaration bolsters Cecala's claim for statutory

4    tolling.  Cecala contends that she did "not have the mental, emotional, or physical capacity

5    to pursue a lawsuit against the defendants any earlier than November 2004." (*Id*. Ex. 1 at 5.)

6    However, the uncontroverted evidence discussed above proves just the opposite.  She

7    contends that there were "always trade-offs" regarding her ability to concentrate and "attend

8    to very discrete daily tasks," but does not deny that she could manage her personal grooming,

9    attend to financial affairs, and travel to Arizona for medical appointments during at least

10   some of the claimed period of disability.  (*Id*. Ex. 1 at 5-6.)  The declaration of Diann

11   Draeger is similarly unavailing.  Ms. Draeger offers no hard evidence of functional disability.

12   She merely elaborates upon the now familiar averments of Cecala's experts, friends, and

13   family as to Cecala's unkempt appearance, depression, and general malaise in the summer

14   of 1999.  (*Id*. Ex. 2 at 11-13.)

15                **5.    Conclusion**

16        Cecala's expert testimony fails to create a triable issue because it is lacking in factual

17   and temporal foundation, and asserts, with few exceptions, unsubstantiated conclusions rather

18   than "hard evidence" of functional disability.  *Florez*, 185 Ariz. at 526, 917 P.2d at 255.

19   Although they are also lacking in temporal foundation in some instances, the declarations

20   from Cecala's family and friends are generally grounded in facts rather than conclusory

21   averments.  However, when viewed in the light most favorable to Cecala, these declarations

22   at most portray a picture of a woman who, while suffering varying degrees of psychological

23   trauma relating to her litigation loss and the sexualization of the attorney-client relationship,

24   was consistently able to carry on the day-to-day affairs of human existence, such as

25   shopping, managing her financial affairs, and traveling from Utah to Arizona for medical

26   appointments.

27        The Cecala and Draeger Rule 56(c) declarations are also insufficient.  The "trade-

28   offs" in attending to everyday activities, depression, and the lack of concentration testified

1   to by them, whether standing alone or read in conjunction with the supporting declarations

2   of her experts, friends, and family, do not create an issue of fact as to Cecala's inability to

3   manage her day-to-day affairs or recognize her legal rights and liabilities from June 21, 1999,

4   through at least November 21, 2002.

5          Finally, the court's complete review of Cecala's own evidence shows that at the

6   relevant times she actually did the ultimate thing the unsound mind exception aims to prove

7   she could not do:  pursue litigation.  She prosecuted, directly and later with counsel, the

8   Nations Bank arbitration and litigation.  She conferred with counsel, researched, and

9   prepared litigation against Newman.  She now asks the court to allow a jury to find that she

10  could not do the very thing she was doing.  This defiance of plain facts and plain meaning

11  would make foolery of the unsound mind exception.

12         Cecala's claims for intentional infliction of emotional distress and non-litigation

13  damages for breach of fiduciary duty are barred by A.R.S. § 12-542.

14         **D.     Equitable Tolling Is Unwarranted**

15         Cecala alternatively contends that the statute of limitations governing her intentional

16  tort and non-litigation fiduciary breach claims should be equitably tolled "to prevent

17  Defendants from benefitting from their own misconduct." (Doc. # 193 at 11.)  Cecala urges

18  the court to invoke its "inherent power" to disregard the statutory limitations period so as to

19  resolve Cecala's claims–which target "severe, outrageous and prejudicial attorney

20  misconduct"–on the merits.  (*Id*. at 11.)

21         Although Cecala alleges grave departures from the standards of conduct governing

22  the attorney-client relationship, neither the egregiousness of the breach nor the seriousness

23  of the resulting injury are alone sufficient to justify equitable tolling.  Cecala has cited no

24  authority for the proposition that the two-year limitations period, which is designed to

25  "protect defendants and courts from stale [and fraudulent] claims where plaintiffs have slept

26  on their rights," may be overcome on such a showing.  *Doe*, 191 Ariz. at 322, 955 P.2d at

27  960 (citation and internal quotations omitted).  Nor has she referred the court to any authority

28  in support of her contention that the limitations period may be tolled to protect a plaintiff

1   who, though aware of her right of action, knowingly "slept on her rights" so as to avoid

2   prejudicing a decision-maker in an independent, though admittedly related, judicial

3   proceeding by suing a lawyer she had discharged long before. (Doc. # 193 at 11.)

4          *Hosogai v. Kadota*, 145 Ariz. 227, 231, 700 P.2d 1327, 1331 (1986), does not support

5   Cecala's argument for equitable tolling. The plaintiff in *Hosogai* filed a wrongful death

6   action within the limitations period, but the action was dismissed for defective service of

7   process. The court permitted the plaintiff to bring a new action against the same defendant

8   for the same tortious conduct despite the fact that the limitations period had run because (1)

9   the plaintiff had timely noticed the defendant by filing a claim within the limitations period;

10  (2) the defendant was not prejudiced in the second action; and (3) plaintiff acted reasonably

11  and in good faith in prosecuting the first action and diligently filing the second action. *Id*.

12  145 Ariz. at 233, 700 P.2d at 1333. None of those circumstances applies here.

13  **VIII.  Causation**

14         Newman next urges summary judgment against Cecala's remaining causes of action

15  for attorney negligence and litigation-injury fiduciary breach for failure to prove a prima

16  facie case of malpractice under Arizona law. Newman more specifically contends that

17  Cecala has failed to present a triable issue as to the "causative link" between the alleged

18  misconduct and the loss of Cecala's claims against NationsBank. (Doc. # 171 at 11-12.)

19         **A.      Cecala's Theory of Causation Is Insufficient**

20         Cecala proposes to prove "causation in this case" with testimony from North Carolina

21  employment attorney Robert M. Elliot ("Elliot"). (Doc. ## 230 at 3; 236 at 7.) Cecala

22  submits that Elliot will "guide [the jury] through the arbitration transcript and related facts

23  that he opines caused or contributed to Newman losing the case." (Doc. # 230. at 7.) Elliot's

24  opinion as to "the adverse effect of [Newman's] conduct on the outcome of the [underlying]

25  case" was disclosed in his December 14, 2006 affidavit. (*Id*. at 3.) Elliot devotes essentially

26  all of that 26-page affidavit to describing Newman's breaches of the standards of care and

27  conduct. (PSOF Ex. 14.) Finally, Elliot states, "In my opinion . . . all of [D]efendant's

28

1   failures in combination, caused or contributed to the loss of Ms. Cecala's underlying

2   employment claims." (*Id*. Ex. 14 at 25.)

3         Depending on the causation issues to be resolved by the malpractice jury, expert

4   testimony on causation may be impermissible, permissible, or even necessary. *Asphalt*

5   *Engineers v. Galusha*, 160 Ariz. 134, 770 P.2d 1180 (Ct. App. 1989) (discussing the use of

6   expert testimony in legal malpractice actions); 4 *Legal Malpractice* § 33:17 at 1118-19

7   ("Expert testimony may be essential for the plaintiff to establish causation. The trier of fact

8   must be able to determine what the result should have been, if the lawyer had not been

9   negligent. . . . [U]nless the causal link is obvious or can be established by other evidence,

10  expert testimony may be essential to prove what the lawyer should have done."); *see Rebel*

11  *Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1435 (9th Cir. 1995) (citing cases on expert

12  affidavits in opposition to summary judgment). The court need not decide whether such

13  expert evidence is permissible or necessary in this case because neither Cecala nor her

14  experts have presented any evidence or reasoned explanation as to why she should have won

15  her arbitration but for Newman's alleged negligence and fiduciary breach. "Net opinions"

16  of the type advanced by Elliot are insufficient. 4 *Legal Malpractice* § 33.18 at 1141 (a "net

17  opinion" is "an opinion that does little more than restate the allegations of the complaint");

18  (PSOF Ex. 14 at 6 ("In reaching this opinion, I have assumed the facts stated in Ms. Cecala's

19  First Amended Complaint.").

20        Elliot's December 14, 2006 affidavit fails to present any evidence of causation as a

21  matter of law. Without factual foundation, Elliot would simply tell the jury that Cecala

22  would have prevailed if Newman had done things differently. (Doc. # 230 at 7.) Elliot asks

23  the court to take his word for it. This he may not do. *Hansen v. United States*, 7 F.3d 137,

24  138 (9th Cir. 1993) ("When the nonmoving party relies on its own affidavits to oppose

25  summary judgment, it cannot rely on conclusory allegations unsupported by factual data to

26  create an issue of material fact."); *LeapSource*, 351 B.R. at 704 (summary judgment for

27  defendant-attorney under Arizona law where plaintiff-client's expert testimony on causation

28  lacked foundation in specific facts and admissible evidence). If Elliot has more to tell the

1   jury than he has told the court, he may not hold back now and thus exempt Cecala from the

2   summary judgment process.

3        Elliot's December 14, 2006 affidavit says that the result in the underlying action

4   would have been different if Newman had been admitted to practice law in North Carolina,

5   or prepared more assiduously for trial, or volunteered legal advice that his client did not seek,

6   or filed a charge of discrimination with the Charlotte division of the EEOC, or challenged

7   the enforceability of the arbitration agreement in a judicial forum, or exercised greater care

8   in the selection of the arbitrators, or obtained some unspecified documentary evidence from

9   NationsBank by pursuing a more aggressive discovery strategy, or abstained from sexual

10  intercourse with his client, or adopted a more cohesive trial strategy, or returned Cecala's

11  client file after he was discharged by her and before the arbitration concluded.  (PSOF Ex.

12  14.)  But the expert makes no attempt to substantiate any of these claims with any facts or

13  reasoned analysis.   He does not discuss any missing evidence or say how it would have

14  changed Cecala's fate.

15       It is specifically fatal to his conclusion that Elliot avoids any discussion of the

16  numerous legal, factual, and credibility problems that plagued Cecala's arbitration claims,

17  problems that are apparent from even the most cursory perusal of the arbitration transcript.

18       Cecala's opposition papers also include "net opinions" on loss causation from

19  fiduciary breach from Professor Hazard, an expert on legal ethics, and Dr. Rutter, Cecala's

20  consulting psychiatrist.  These opinions assume everything and help the jury with nothing.

21  *See* Fed. R. Evid. 702 (expert opinions must assist the trier of fact).  Though they merit little

22  discussion, the Hazard and Rutter affidavits will be addressed for the sake of completeness

23  below.

24       **B.    Procedural Issues**

25       The Motion puts Cecala "on notice that [Defendants] are putting her to her *Celotex*

26  burden as to all her theories, not just those raised in this Motion." (Doc. # 171 at 12.)  Cecala

27  objects to Newman's motion practice, claiming that she had "no notice or opportunity to brief

28  any specific objection" relating to the sufficiency of her causation evidence. (Doc. # 230 at

1   5 n.4.) This argument lacks merit. Newman has carried his initial burden of production, and

2   causation for each of Cecala's malpractice claims is properly before the court in a summary

3   judgment posture. *High Tech Gays*, 895 F.2d at 574.

4                **1.    Newman Carried His Initial Burden Under Rule 56(c)**

5        "[A] party seeking summary judgment always bears the responsibility of informing

6   the district court of the basis for its motion, and identifying those portions of the pleadings,

7   depositions, answers to interrogatories, and admissions on file, together with the affidavits,

8   if any, which it believes demonstrate the absence of a genuine issue of material fact."

9   *Celotex*, 477 U.S. at 323 (internal quotations omitted). In *Nissan Fire & Marine*, the Ninth

10  Circuit interpreted *Celotex* as follows:

11       [U]nder . . . *Celotex*, a moving party without the ultimate burden of persuasion at trial
         may carry its initial burden of production by either of two methods. The moving party
12       may produce evidence negating an essential element of the nonmoving party's case,
         or, after suitable discovery, the moving party may show that the nonmoving party
13       does not have enough evidence of an essential element of its claim or defense to carry
         its ultimate burden of persuasion at trial. The first method . . . may be more commonly
14       employed . . . [b]ut this does not mean that the second method, at issue in *Celotex*, is
         legally disfavored. The Supreme Court has clearly indicated that, in appropriate
15       cases, a moving party may carry its initial burden of production by showing that the
         nonmoving party does not have enough evidence to carry its ultimate burden of
16       persuasion at trial.

17  210 F.3d at 1105-06.

18       The nonmovant "must have had sufficient time and opportunity for discovery before

19  a moving party may be permitted to carry its initial burden of production by showing that the

20  nonmoving party has insufficient evidence." *Id*. at 1105-06. This requirement prevents the

21  movant from "railroading" the opposing party with a premature "no evidence" motion for

22  summary judgment. *See* Fed. R. Civ. P. 56(f).

23       Newman satisfied his initial burden of production. He contends that Cecala's evidence

24  fails to create a genuine issue of material fact as to whether Cecala should have prevailed

25  at the NASD but for her attorney's malpractice. (Doc. # 171 at 12-17.) He explains why the

26  claims of negligence in the selection of the arbitral forum and negligence in the prosecution

27  of the Title VII case are insufficient as a matter of law. (Doc. # 171 at 13-17.) Newman also

28

41

1    noted the insufficiency of evidence of causation in general.  No more is required of him

2    under *Celotex* and *Nissan Fire & Marine*.

3         In her Response, Cecala avers that "[a]ll of her claims are fully supported by the

4    evidence, reasonable inferences, and expert witness testimony," and she attempts to

5    substantiate that claim by reference to her Statement of Facts.  (Doc. # 193 at 1.)  Cecala's

6    later contention that she "had no notice or opportunity to brief" the causation issues (Doc.

7    # 230 at 5 n.4) is also belied by her statements during the March 28, 2007 oral argument.

8    *E.g.*, (Doc. # 239 at 35-39) ("We laid out why there was causation.  We laid out why there

9    was a winning case.").  Finally, the court invited supplemental briefing on the legal standards

10   governing proof of causation in an action for legal malpractice.  Cecala responded with 14

11   pages of briefing.  (Doc. ## 230, 236.)

12        Cecala may not proceed on the "mere hope that trial would produce evidence she was

13   unable to garner at the state of summary judgment."  *Parker v. Federal Nat'l Morg. Ass'n*,

14   741 F.2d 975 (7th Cir. 1984).  "The very mission of the summary judgment procedure is to

15   pierce the pleadings and to assess the proof in order see whether there is a genuine need for

16   trial."  Fed. R. Civ. P. 56, Advisory Comm. note to 1963 amend.  Cecala's opposition papers

17   do not point to any admissible evidence ignored or overlooked by Newman.  Cecala's

18   responsive memorandum does not contain any reasoned analysis from which a reasonable

19   juror, drawing all reasonable inferences in her favor, could find that Cecala should have

20   prevailed against NationsBank but for Newman's malpractice.  *Shumway*, 199 F.3d at 1103-

21   04. There is no basis for trial here because Cecala has failed to link any allegation of

22   malpractice contained in the Second Amended Complaint to the loss of her claim in the

23   arbitral forum.

24              **2.    Cecala's Supplemental Expert Affidavit Was Untimely**

25        The second procedural issue is the timeliness of Elliot's Supplemental Affidavit.

26   (PSOF Ex. 16.) The March 6, 2006 Case Management Order, as amended, (Doc. ## 94, 148)

27   set a  December 14, 2006 deadline for the disclosure of Cecala's expert witnesses required

28

1   by Fed. R. Civ. P. 26(a)(2)(B).  The court has repeatedly emphasized that the deadlines

2   prescribed by Case Management Order are not precatory.

3          The opinion of Cecala's standard of care expert was first disclosed on December 14,

4   2006, in compliance with the Case Management Order. (PSOF Ex 14.)  Included in Cecala's

5   March 5, 2007 opposition papers, however, were sixteen pages of new testimony from

6   attorney-expert Elliot.  (*Id*. Ex. 16.)  Although styled as a "Supplemental Affidavit," and

7   offered for "clarification purposes," Elliot's submission is in fact a belated attempt to provide

8   some foundation for his previous wholly unsubstantiated assertion that Newman's multiple

9   "failures in combination, caused or contributed to the loss of Ms. Cecala's underlying

10  employment claims."  (Doc. # 238 at 4; PSOF Ex. 14 at 25.)

11         Elliot does not contend that supplementation was required to account for new

12  information not known to him at the time of his original report.  Nor does the expert attempt

13  to justify his untimely report on any other ground contemplated by Fed. R. Civ. P. 26(e)(1)

14  or 36(c)(1).   Instead, Elliot submits that his additional testimony was necessitated by

15  Newman's counsel's failure to inquire during his February 6, 2007 deposition as to the

16  undisclosed foundation for his original opinion on the subject of causation. (PSOF Ex. 16

17  at 2.)  That argument is without merit.

18         It is the obligation of the party making belated disclosure to show justification or

19  harmlessness.  *Wilson v. Bradlees of New England, Inc*., 250 F.3d 10, 21 (1st Cir. 2001)

20  (quoted in *Yeti By Molly, LTD. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1107 (9th Cir.

21  2001). Elliot's March 5, 2007 submission was two and a half months late.  The Supplemental

22  Affidavit is prejudicial to Newman and, having been filed after the applicable deadline

23  without substantial justification, it will be excluded pursuant to Fed. R. Civ. P. 37(c)(1).

24         In her opposition memorandum, Cecala contends that Newman's March 30, 2007

25  Motion to Strike Elliot's Supplemental Affidavit was unauthorized and untimely in its own

26  right. (Doc. # 238 at 1-2.) Newman's Reply on the Motion for Summary Judgment objected

27  to the legal sufficiency of Elliot's Supplemental Affidavit, but did not challenge its untimely

28  disclosure. (Doc. # 206 at 10-11.)  At oral argument, Newman objected more specifically

43

1    to the belated supplementation, followed by a written objection to the same effect.  (Doc. #
2    227.)

3         Though one could view it different ways, the court concludes that the timeliness
4    objection raised at oral argument was sufficient.  First, the timeliness objection to late expert
5    testimony could be raised at trial even if it was lost for summary judgment.  Absent some
6    other unfairness to Cecala on summary judgment, there is no purpose to denying summary
7    judgment based on evidence that would be excluded at trial, resulting in judgment as a matter
8    of law and a wasted trial.  Second, Cecala is not prejudiced by Newman's raising the
9    timeliness objection at oral argument because Cecala could have done nothing to save the
10   affidavit if Newman had objected more clearly in their reply brief.  Third, the court's
11   authority to enforce case management deadlines is well established.  "[T]he district court has
12   an interest in the efficient management of its docket.  Whenever a party, without good cause,
13   neglects to comply with reasonable deadlines, the court's ability to manage its docket is
14   compromised.  Courts are entitled to take sensible measures to guard against such debilitating
15   occurrences."  *Santiago-Diaz v. Laboratorio Clinico*, 456 F.3d 272, 277 (1st Cir. 2006).

16        It would be unfair to force Newman to respond with any specificity to the opinions
17   first disclosed in Elliot's Supplemental Affidavit.  *See Yeti By Molly*, 249 F.3d at 1107
18   (litigant not required to depose opposing party's damages expert when that expert's report
19   was not timely disclosed); *Santiago-Diaz*, 456 F.3d at 277 ("[P]laintiff's foot-dragging in .
20   . . providing his report deprived defendants of the opportunity . . . to prepare their
21   defenses.").  Newman's Motion to Strike Elliot Supplemental Affidavit (Doc. # 227) will be
22   treated as an objection and will be granted as such.  The Motion may have been proper as a
23   motion to strike since the very filing of the document was challenged, but in any event its
24   function as an objection was clear.

25        Newman is entitled to summary judgment on Cecala's claims for loss of her
26   arbitration claims.  For the sake of thoroughness and to further show the general lack of
27   actionable negligence itself, the specifics of both Elliot's Original and Supplemental
28   Affidavits will be addressed below.

## C.   Causation Evidence from Elliot's Affidavits

Even if it were admitted, Elliot's Supplemental Affidavit fails to supply a causal nexus between the allegations of attorney malpractice and the loss of Cecala's arbitration claims. Elliot elaborates upon his original, summary conclusion, but his out-of-time averments offer no reasoned analysis of the Bank's evidence or explanation how every reasonable trier of fact should have disregarded the Bank's cumulative controverting evidence, Cecala's concessions on cross-examination, and her general failure of credibility at the arbitration hearing.  When stripped of its extra words without extra content, Elliot's Supplemental Affidavit, like its predecessor, asserts causation by faith alone.

### 1.   Newman's "Ineffective Representation"

Elliot ignores the pervasive contradictory evidence and credibility problems in the arbitration transcript and confirmed by the court's own review of that record and instead asserts that "through [Newman's] ineffective presentation, facts which would have supported Ms. Cecala's claims were lost or buried in a mass of irrelevant and repetitive evidence." (PSOF Ex. 16 at 4.)  Elliot also asserts that Cecala's lack of credibility can somehow be attributed to Newman's ineffective witness preparation, rather than upon the multiple instances in which her testimony was directly impeached by opposition witnesses and contradictory facts.  (*Id*. Ex. 14 at 18.)  He avers that "Mr. Newman's presentation of Ms. Cecala's case, both through Ms. Cecala's testimony and the testimony of other witnesses on direct and cross examination was extremely disjointed." (*Id*. Ex. 14 at 22.)  He adds that the "clarity, focus, and priority of the most important and favorable evidence which are indispensable to an effective presentation to the fact finder was sacrificed through Mr. Newman's lack of preparation."  (*Id*. Ex. 14 at 22.)  Elliot then concludes that effective presentation of the record evidence would have led the arbitrators to find in Cecala's favor. (*Id*. Ex. 16 at 11; Doc. # 230 at 7.)

 "In a suit complaining of the manner in which proof was presented and the manner of examination and cross-examination of witnesses, only by pure guesswork can the verdict of a jury be examined and a so-called cause for that verdict be determined. No man shall

1  suffer a judgment against him based on guess." *Stricklan v. Koella*, 546 S.W.2d 810, 813

2  (Tenn. Ct. App. 1976); *McKnight v. Dean*, 270 F.3d 513, 518 (7th Cir. 2001) (Legal

3  malpractice is "not a synonym for undistinguished representation." It is not "a failure to be

4  brilliant, but a failure to come up to even a minimum standard of professional competence.").

5  Elliot's conclusory opinion as to the dispositive effect of more zealous representation is

6  entirely speculative.

7       Elliot provides no specific explanation *why* a jury in this action could conclude that

8  Cecala's testimony should have been believed and the phalanx of contradicting witnesses all

9  disbelieved if she had been favored with more diligent preparation and more "effective

10  presentation to the fact finder" by her lawyer. (PSOF Ex. 14 at 22.) He simply asks the court

11  to take his word for it. (*E.g.*, *id*. Ex. 16 at 7 ("Mr. Newman's failure to prepare for Ms.

12  Cecala's arbitration hearing [] permeated every aspect of his performance. Undoubtedly, his

13  departures in this respect contributed to or caused the loss of Ms. Cecala's claims.").) This

14  is not sufficient. *See Estate of Re*, 958 F. Supp. at 907, 921, 924 (plaintiffs failed to show

15  that there should have been a different result in arbitration if the attorneys adopted the

16  litigation strategies urged by them).

17              **2.    Improper Selection of and Hostile Attitude Toward the
                        NASD Arbitrators**
18
19       Similarly unavailing is Elliot's attack on Newman's selection of and behavior toward

20  the NASD arbitrators. (PSOF Ex. 14 at 15; Ex. 16 at 7-8.) Elliot states, "The transcript of

21  [the arbitration] proceedings in May-June 1999, reflects that the panel members were

22  becoming more and more impatient with Mr. Newman's long and repetitive questioning of

23  witnesses on matters of which the witnesses claimed no knowledge, or matters consistent

24  with Mr. Newman's pleadings, or matters which the panel had ruled were objectionable for

25  one reason or another." (*Id*. Ex. 16 at 8.) When the panel objected to Newman's line of

26  questioning, Cecala's expert avers that "Mr. Newman became rude, sarcastic and insulting

27  to the panel members," which in turn drew stern admonishments from the tribunal. (*Id*. Ex.

28  16 at 8.) Newman's display of "contempt" toward the fact finders who held "his client's

46

1    legal fate" led Elliot to conclude that Newman's behavior "probably destroyed" Cecala's

2    case and extinguished any chance of recovery.  (*Id*. Ex. 16 at 9.)

3         Taking these premises as true, they would not permit a reasonable jury to conclude

4    that Cecala otherwise should have won and that the arbitrators put aside law and evidence

5    to punish her for her lawyer's tactlessness.  A finding of causation from lawyer demeanor

6    would be grounded in speculation about how a "better" result should have occurred.  4 *Legal*

7    *Malpractice* § 30:40 at 611-12.  Such an inference would run counter to public policy.

8    "Allowing proof of whether a jury was prejudiced [by attorney demeanor] is inconsistent

9    with the assumption that the trier of fact acted impartially" and  "presupposes an improper

10   response by the trier of fact." *Id*. at 611-12.  This is illustrated in  *Holley v. Massie*, 100 Ohio

11   App. 3d 760, 654 N.E.2d 1293 (Ct. App. 1995), where the attorney repeatedly fell asleep at

12   deposition and trial, allegedly leading the jury to formulate a prejudicial inference about the

13   merits of the plaintiff's case.  In upholding summary judgment for failure to prove causation

14   of cognizable injury, the court emphasized that the jury was presumed to have deliberated

15   on evidence, not the conduct of counsel.  "To permit the sanctity of the jury room to be

16   broken to determine how jurors reacted to the demeanor of counsel during the trial would

17   seriously undermine the stability and continued efficacy of trial by jury."  *Id*. at 767, 654

18   N.E.2d at 1297.

19        Furthermore, there is a "liberal federal policy favoring arbitration agreements."

20   *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  That policy

21   is served in part by the presumption that arbitral tribunals are fully capable of adjudicating

22   statutory claims in a neutral and unbiased manner.  *See Gilmer v. Interstate/Johnson Lane*

23   *Corp.*, 500 U.S. 20 (1991); *EEOC v. Luce, Forward, Hamilton &* Scripps, 345 F.3d 742, 747

24   (9th Cir. 2003); *Koveleskie v. SBC Capital Mkts., Inc.*, 167 F.3d 361, 368 (7th Cir. 1999);

25   *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 15 (1st Cir. 1999).

26        Cecala cites *Berkeley v. Liddle*, 247 A.D.2d 231, 668 N.Y.S.2d 354 (App. Div. 1998),

27   in support of her contention that Newman's "unwarranted, angry and belligerent behavior

28   in arguing his client's case to the trier of fact is alone, without anything more, sufficient

47

1   evidence of malpractice to go to the jury." (Doc. # 193 at 17.)  That case held, without any

2   recitation of operative facts, that "issues of fact exist precluding summary judgment,

3   including whether the demeanor of the attorney who represented the client in arbitration was

4   so belligerent as to be offensive to the panel and prejudice the client's case." *Berkeley*, 247

5   A.D.2d at 231, 668 N.Y.S.2d at 354.  The emphasis of the court's summary decision was not

6   on the lawyer's belligerent  attitude, but rather his negligence in developing expert witness

7   testimony. *Id.* at 231, 688 N.Y.S.2d at 354-55.  Nevertheless, in submitting the case to a jury

8   in part upon a showing of attorney belligerency, the court failed to account for the

9   speculation inherent in the inference of causation from "offensive" lawyer demeanor, and

10  disregarded the policy considerations implicated by a challenge to the impartiality of the

11  finder of fact.  The case is also inconsistent with the requirement of proof of what any

12  reasonable trier should have found, not what the original trier of fact would have found.

13  *Phillips*, 152 Ariz. at 418, 733 P.2d at 303.  The *Berkeley* decision, which has been criticized

14  by at least one commentator, 4 *Legal Malpractice* § 30:40 at 611-12, is contrary to Arizona

15  law and finds no support in the New York cases.

16        Elliot's related averment that Newman "departed from the standard of care in failing

17  to investigate, evaluate and exercise professional judgment as to the selection of the

18  arbitrators who served on the arbitration panel" must also be rejected.  This conclusion is

19  inherently speculative and contrary to public policy.  As summarized by one commentator,

20  "Causation issues and important public policy considerations usually preclude a cause of

21  action . . . for error concerning the selection, voir dire, or general jury process.  Since basic

22  policy dictates that either trier of fact should be equally fair, a lawyer should not be liable for

23  choosing one over the other."  4 *Legal Malpractice* § 30:39 at 595-96.  It follows that

24  "[a]llowing proof that a judge is not fair, less reasonable or less generous is contrary to the

25  concept of judicial impartiality."  *Id.* at 596.  Permitting "such a contention to be made,

26  expressly or impliedly, in a legal malpractice action is antithetical to sound public policy."

27  *Id.* at 596; *see Estate of Re*, 958 F. Supp. at 923 (criticizing the position, abandoned by

28  plaintiffs themselves, that the selection of an arbitrator could be actionable malpractice).

1    Moreover, even if an inference of injury were permissible on this ground, Elliot advances no

2    rationale for gainsaying Newman's choice of arbitrators.  (PSOF Ex. 14 at 15.)

3                  **3.    Inadequate Discovery: Failure to File with the EEOC**

4            Yet another theory of causation advanced by Elliot is that Newman would have

5    discovered additional supportive evidence if he had filed a charge of discrimination with the

6    Charlotte Division of the EEOC.  (PSOF Ex. 14 at 11-13.)  Newman observes that "through

7    the EEOC procedures, the attorney for the employee will ultimately have access to

8    preliminary 'discovery' in the factual record developed by EEOC, regardless of EEOC's

9    disposition of the charge; and under EEOC's mediation procedures, there is a more effective

10   opportunity for early settlement, avoiding the time and expense of litigation."  (*Id*. Ex. 14 at

11   12.)  He further asserts that foregoing the discovery opportunities and "roadmap" for trial

12   preparation that would have been generated by the EEOC process led to the "destruction" of

13   Cecala's claims.  (*Id*. Ex. 16 at 4.)   However, this conclusory averment does not provide a

14   sufficient basis for a jury to conclude that Cecala *should* have won in the underlying action.

15           Elliot's opinion as to the practical effect of Newman's strategic decision to forego the

16   EEOC process is entirely speculative.  He does not specify, for example, what evidence

17   Newman might have disgorged from NationsBank with the assistance of the EEOC, or how

18   those additional facts, if discovered, should have led to a different outcome.  He avers only

19   that the filing of a charge with the EEOC would have facilitated discovery, creating

20   "leverage" against the employer, and the "opportunity for early settlement," thereby

21   "avoiding the time and expense of litigation."  (*Id*. Ex. 14 at 12.)  But such abstract

22   pronouncements cannot take the place of actual proof.  Causation must be inferred from

23   facts, not from bare expert endorsement.  *See Allbritton v. Gillespie, Rozen, Tanner &*

24   *Watsky, P.C.*, 180 S.W.3d 889, 892 (Tex. Civ. App. 2005) (rejecting "[t]ake my word for it,

25   I know" affidavits from attorney-experts in legal malpractice actions).

26           Cecala has the burden of establishing  not only what Newman should have uncovered

27   during the discovery processes, but also that use of the information should have produced a

28   better result.  *See Ross v. Adelman*, 725 S.W.2d 896, 897 (Mo. Ct. App. 1987) ("The record

                                                         49

1   is . . . totally devoid of any proof that [the result would have been different] had respondent

2   made the investigation [urged by appellants]. . . . That proof by appellants is essential to their

3   claim.  This lack of evidence is fatal to appellants' case because there is no showing that any

4   acts or omissions complained of caused appellants to sustain damage.").  Elliot's testimony

5   provides no basis from which a juror could reasonably conclude that Cecala should have

6   prevailed against NationsBank if her lawyer had actually engaged the EEOC and employed

7   that legal process to his client's advantage.  Elliot's lost opportunity for discovery theory

8   fails, as a matter of law, to support a reasonable jury inference of loss causation.

9                    **4.        Loss of a Procedural Advantage:  Foregoing Litigation**

10          Elliot next avers that Newman's decision to proceed directly to arbitration itself

11  caused Cecala to lose her claim.  He contends that the "waiver of any opportunity of

12  litigation" had "serious repercussions" because it resulted "in some loss in the rights of

13  discovery" and also led to "the loss of a trial by jury."  (PSOF Ex. 14 at 13.)    This too is

14  insufficient for a jury to find causation and insufficient as a matter of law for legal

15  malpractice.

16          Elliot provides no factual support for his contention that Cecala lost her claim in the

17  arbitral forum simply because her lawyer opted to litigate there.  *See Stroock & Stroock &*

18  *Lavan v. Beltramini*, 157 A.D.2d 590, 591, 550 N.Y.S.2d 337, 338 (App. Div. 1990)

19  ("Counsel's decision to proceed before the courts rather than in arbitration *at worst* amounts

20  to an error in professional judgment which does not rise to the level of malpractice.")

21  (emphasis in original).

22          Elliot also opines, "In any event, even if [Newman was] correct that arbitration was

23  mandatory, the worst that could have happened was that NationsBank would have filed a

24  motion to require arbitration; and in that event, NationsBank would have had the burden of

25  proving the necessity of arbitration."  (PSOF Ex. 14 at 1.)  Elliot thus urges that, believing

26  the arbitral agreement to be enforceable, Newman should have filed in a judicial forum

27  anyway, in the hopes that NationsBank would somehow fail or least expend considerable

28  sums of money to specifically enforce the clause.  (*Id.* Ex. 14 at 13.) Elliot does not aver that

1  Cecala would have prevailed if her lawyer had followed this course of action.  Aside from

2  the fact it does not bolster Cecala's prima facie case for causation, this line of reasoning also

3  is insufficient as a matter of law for legal malpractice.

4          In *Jones Motor Co. v. Protective Ins. Co.*, 197 F.3d 1190 (7th Cir. 1999), the court

5  considered the issue of whether "the loss of a procedural advantage can give rise to a

6  malpractice suit even if the advantage was not essential to the protection of the client's

7  substantive rights." Judge Posner answered in the negative.  The insurance company plaintiff

8  sued its former counsel for negligently failing to obtain a jury trial in the underlying personal

9  injury action, allegedly leading to a higher damage award.  The court upheld dismissal for

10  failure to prove damages.

11          Through the defendants' negligence Jones and its insurer lost their right to a jury trial
        and were forced to submit to a bench trial–which means they got a trial before an
12      authorized tribunal.  They allege no error in the conduct of the trial by the judge
        whom they did not want to try the case, and they did not appeal from the judgment
13      that he rendered, large as it was.  The plaintiffs thus got a fair trial and there is no
        basis for supposing that the judgment was excessive.  [W]e think . . . a malpractice
14      plaintiff cannot prevail merely by showing that his claim had some nuisance value.
        To impose malpractice liability for booting a nuisance suit would . . . simply
15      encourage nuisance suits, of which we have enough already.

16  *Id.* at 1192-92.

17          Cecala is asking the court to hold an attorney liable on the very theory rejected in

18  *Jones Motor Company*.

19              **5.    Termination of the Representation**

20          Elliot finally contends that Cecala would have won if she had not been forced to

21  discharge lawyer Newman prior to the conclusion of the arbitration.  According to Elliot,

22  the termination of the attorney-client relationship prejudiced the merits of Cecala's case in

23  three ways.  First, Cecala was forced to represent herself during the October 1999 hearing

24  dates.  Although she presented evidence, Cecala was "no match" for the Bank's lawyer.

25  (PSOF Ex. 16 at 10.)  Second, Cecala's pro se representation was hamstrung by Newman's

26  refusal to return the client file until 2000.  (*Id.* at 12; Ex. 14 at 23; Doc. # 193 at 7.)  Finally,

27  Cecala was "unable to provide a closing argument or brief to the arbitration panel."  (PSOF

28  Ex. 16 at 10.)  As a result, "the evidence in the record which could have provided a basis for

51

1    a strong response to the bank's brief" went undiscovered. (*Id.* Ex. 16 at 10.)  Elliot

2    concludes, without more, "The failure to present a closing argument or brief insured the loss

3    of Ms. Cecala's claims." (*Id.* Ex. 16 at 10.)

4           Like Elliot, the court is deeply troubled by Cecala's allegations of attorney

5    misconduct.  However, Elliot's untimely arguments fail as a matter of law to create a triable

6    issue of loss causation because they are wholly lacking in foundation and are speculative to

7    boot.  The court takes it as true that Cecala was outgunned by the Bank's attorney during the

8    October 1999 hearings.  But the mere fact that Cecala appeared  pro se does not suggest that

9    the result on the merits would have been different if Newman had stayed on.  Elliot is merely

10   speculating about the harmful effect of Cecala's untrained presentation and legal

11   argumentation upon neutral decision-makers, and this is insufficient as a matter of law to

12   permit a jury to draw a reasonable inference of loss causation.   In fact, the transcript from

13   the final two hearings suggests that the panel went to great lengths to accommodate Cecala.

14   They granted her a recess on October 19, 1999, for example, so that she could retrieve

15   documents from the Charlotte airport, and allowed her wide latitude in putting on her case

16   in chief in innumerable other ways.  (Doc. # 246 Ex. 2 at 100-10.)

17          Nor does Elliot articulate any specific reason why Cecala would have prevailed on the

18   merits if Newman had returned the client file in time for the October hearing dates.  He

19   simply notes that Newman's demand for unpaid legal fees was unethical. (PSOF Ex. 14 at

20   23.)  Cecala herself failed to identify anything in the client file that, if made available to her,

21   would have changed the outcome of her case.  (DSOF Cecala Dep. Jan. 5, 2007 p. 305.)

22          Finally, Elliot provides absolutely no factual support of his contention that Cecala's

23   failure to present a closing argument or post-hearing brief "insured" the loss of her claims.

24   He identifies no evidence that, if located and presented to the arbitrators at the close of the

25   hearing, would have changed the outcome of the arbitration.  The lack of substantiation is

26   fatal to Elliot's claim.  A fair-minded jury could not conclude that a reasonable  arbitrator

27   would have disregarded the substantive flaws in Cecala's case in favor of unidentified but

28   supposedly dispositive evidence after 18 full days of litigation.

1

## D.    Other Evidence of Causation

2

### 1.    Hostile Work Environment Sexual Harassment Claim

3      Cecala's Statement of Facts contains the following specific allegations of a hostile

4  work environment: (1) vulgar language used by NationsBank employees that was demeaning

5  to women, and Bank acquiescence to that conduct ; (2) a visit from a male stripper in "late

6  1994 or early 1995"; (3) lack of Bank sensitivity training; and (4) unwelcome sexual

7  advances by Mike Malone, a NationsBank executive.  (PSOF 23-24.) Cecala supports these

8  allegations primarily by citation to the transcript of the NASD arbitration.

9      In its closing brief, the Bank identified multiple factual inconsistencies in Cecala's

10  claims of  hostile work environment and sexual harassment, noted the lack of corroborating

11  evidence to support the foregoing allegations, impeached Cecala's credibility as a witness,

12  and raised an affirmative employer defense.  (DSOF Ex. 11 at 25-47.)

13      Other than the Elliot affidavits considered and rejected above, Cecala marshals only

14  one piece of evidence in support of her conclusion that reasonable arbitrators should have

15  found in her favor on the claim of hostile work environment but for Newman's malpractice:

16  the corroborating declaration from her cousin Teri Borton, whose testimony was excluded

17  from the arbitration proceeding.  (PSOF 24.)  Ms. Borton's testimony is insufficient to create

18  a triable issue of causation.

19      Cecala contends that her cousin Teri Borton was "on the witness list for the

20  arbitration, was available to testify at the arbitration hearing, and had information about the

21  Bank's executives' unwelcome advances towards Renee." (PSOF 24.)  "The determination

22  of whether the attorney's omission caused injury is tested by whether the omitted evidence

23  should have provided a more advantageous result in the underlying action. . . .  Omitted

24  evidence must have a causal relationship to the claimed loss." 4 *Legal Malpractice* § 30:40

25  at 605-06; *see Rubens v. Marson*, 417 F. Supp. 2d 262, 276 (S.D.N.Y. 2006) (As to

26  negligent failure to call a witness on summary judgment, "The argument fails, as a matter of

27  law, for [defendant's] failure to call these witnesses was one of reasonable trial strategy, and

28

1    in any event, a reasonable jury could not find that either witness would have changed the

2    outcome of the arbitration.").

3          Failure to call Ms. Borton could not have caused the loss.  The omitted evidence was

4    almost entirely self-serving hearsay–Ms. Borton's recitation of Cecala's statements that Mike

5    Malone tried to manipulate her into a sexual relationship, and that Tom Neary, another

6    NationsBank executive, made unwelcome sexual advances toward her.  (PSOF Ex. 27 at 2.)

7    This lacked independent evidentiary value.  Ms. Borton recounts hearing Cecala's side of a

8    phone call from Mike Malone *after Cecala resigned* in which he proposed a date.  That was

9    not evidence of hostile environment.  It follows that Ms. Borton's declaration does not offer

10   a "reasonable connection between the act or omission of the defendant and the damage which

11   the plaintiff has suffered."  *Purcell*, 18 Ariz. App. at 82, 500 P.2d at 342.

12                **2.**      **Disparate Treatment Claim**

13         Cecala claimed that she was paid less than her male comparators, deprived of

14   resources, and not promoted by NationsBank because of her sex.  (DSOF Ex. 9 at 5; PSOF

15   at 20-23.) Cecala substantiates this claim only by reference to Elliot's untimely affidavit and

16   citation to the transcript from the underlying litigation.  (*Id*. at 20-23.)  The flaws in Elliot's

17   "net opinion" need not be rehearsed here.  Elliot simply takes the facts alleged by Cecala to

18   be true and concludes on that basis alone that "the above facts establish [a] claim[] for . . .

19   hostile work environment." (*Id*. Ex. 16 at 16.)  Cecala's reliance on the arbitration transcript

20   is also misplaced.

21         The arbitration transcript demonstrates that, upon complaining of what she perceived

22   to be discriminatory pay, a NationsBank executive offered to remedy Cecala's concerns by

23   raising her compensation $10,000, placing her at the exact same pay level as Jim Sherrill, a

24   male colleague whose educational background and work experience were in fact superior to

25   that of Cecala.  (RC-00988-99.)  Cecala failed to identify any similarly situated male Bank

26   employees who were paid more than she was.  (RC-00480.) Additionally, Cecala provided

27   no credible support for her contention that the Bank failed to promote or withheld resources

28   because of her sex.  (RC-00565.)

1    Cecala's Notice of Filing Rule 56(c) Declarations included submissions from Jason

2    Budd and Patrick Tadie.  (Doc. # 224 Ex. 4-5.)  Jason Budd says nothing about what he

3    might have testified to if he had been called  (*Id*. Ex. 4.)   Patrick Tadie was prepared to

4    testify in the NASD arbitration as to Cecala's skills as a deal manager, and also to the

5    difference between Cecala's compensation and that of other investment bankers.  (*Id*. Ex. 5

6    at 21-22.)  But he says nothing about any male comparators.

7    In short, Cecala has identified no evidence in opposition to Newman's Motion that

8    could lead a fair-minded jury to conclude that Newman's alleged malpractice, rather than the

9    inherent weakness of Cecala's disparate treatment claim, caused the adverse arbitral award.

10              **3.      Evidence of Litigation Injury from Sexual Relationship**

11    Cecala also contends that Newman's "self-serving, manipulative and predatory"

12    sexual relationship caused her to lose her otherwise meritorious Title VII claims because it

13    "interfered" with and "adversely affected" Newman's representation. (Doc. # 193 at 4-5.)

14    But Cecala  provides no factual support for this claim.  Cecala has told the court when and

15    where the sexual contact was alleged to have occurred.  (PSOF 5-6)  She then relies on Dr.

16    Rutter and Professor Hazard to substantiate the causal connection between that conduct and

17    the claimed litigation injury.

18    Dr. Rutter's testimony must be rejected at the outset as irrelevant.  Dr. Rutter's

19    affidavit speaks only to the fear, shame, loss of self-esteem, depression and post-traumatic

20    stress experienced by Cecala as a result of Newman's sexual misconduct.  (*Id*. Ex. 9.)  These

21    conclusions are relevant only to the time-barred claim of psychological injury from willful

22    fiduciary breach.   Causation of litigation injury cannot be inferred from Dr. Rutter's

23    testimony.

24    Professor Hazard's affidavit fares no better.  According to him, Cecala's allegations

25    of non-consensual sex, if true, may subject Newman to professional discipline in multiple

26    jurisdictions.  (*Id*. Ex. 11 at 2-6.)  Professor Hazard's testimony may have some evidentiary

27    value as to whether Newman breached the applicable standards of care and conduct.  But

28

55

1  Newman's Motion is directed to the absence of causation, and Professor Hazard provides

2  nothing from which a jury could draw that critical inference.

3      For example, on the final page of his submission, Professor Hazard opines that

4  Newman directed his attention to pursuing a sexual relationship rather "than preparing his

5  client for testimony," which "directly affected his ability to represent [Cecala] competently

6  and directly harmed Cecala's ability to participate in her case, both as a client and as a key

7  witness." (*Id*. Ex. 11 at 8.)  But he provides no factual foundation for this bare conclusion.

8  *See LeapSource*, 351 B.R. at 705.

9      Apart from its lack of foundation, Professor Hazard's affidavit is insufficient as a

10  matter of law to generate a triable issue of material fact on causation.  Malpractice liability

11  does not attach for undistinguished representation, whatever its cause.  *See McKnight*, 270

12  F.3d at 518.  Professor Hazard's conclusion that Cecala should have prevailed in the

13  underlying action but for Newman's sexual misconduct is inadmissible speculation about the

14  effect of better trial preparation upon the merits of Cecala's case, and would be unhelpful to

15  a malpractice jury.

16  **IX.    Failure to Assert Retaliation**

17      Cecala finally contends that Newman's failure to bring a claim for retaliation against

18  NationsBank deprived her of an opportunity to recover damages against NationsBank under

19  Title VII.  (Doc. # 67 ¶ 43; PSOF at 16, 18-19.)  This argument does not survive summary

20  judgment.  Even if Newman was negligent in failing to urge Title VII retaliation, Cecala has

21  failed to show that Newman's omission caused her to sustain much more than nominal

22  damages, which it could not have been negligent to fail to pursue at a cost in attorney's fees

23  that would dwarf any recovery.

24      The Supreme Court of Maine defined the elements of a "failure to plead" malpractice

25  claim in *Niehoff v. Shankman & Assoc. Legal Center, P.A.*, 2000 ME 214, 763 A.2d 121

26  (2000).  To survive summary judgment, the plaintiff-client must "demonstrate that there are

27  facts in dispute which are sufficient to allow a jury to conclude that (1) the defendant-

28  attorney was negligent in representation of the plaintiff; and (2) the attorney's negligence

1  caused the plaintiff to lose an opportunity to achieve a result, favorable to the plaintiff, which

2  (i) the law allows; and (ii) the facts generated by plaintiff . . . would support, if the facts were

3  believed by the jury." 763 A.2d at 124.

4          **A.    Retaliatory Acts**

5          After lodging complaints about discriminatory pay, lack of resources, and a hostile

6  work environment with NationsBank executives, Cecala contends that she (1) was

7  interrogated about her grievances "within earshot of her coworkers" by Mr. Ellison, her

8  supervisor, making her feel "embarrassed" and "uncomfortable"; (2) endured "aggressive,

9  extremely rude, and extremely intimating" comments from Mr. Ellison and other Bank

10 executives, such as an admonition to "stop whining" about her compensation, and a

11 command to "sit down, shut up, and sell" mortgage bonds; (3) received undeserved poor

12 performance reviews from Bank executives; (4) rebuffed inquiries from male colleagues

13 about her sexual involvement with other NationsBank employees and other sexual innuendo,

14 which led her to request and receive a transfer to another department of the Bank; (5) felt that

15 Bank management was refusing to redress her grievances; and (6) was "not given any

16 accounts" and "went to work every day with nothing to do" for approximately two weeks,

17 which left her feeling "frozen out" of the workplace and led her to tender her resignation.

18 (PSOF 12, 18, Ex. 16 at 3-16; Doc. ## 193 at 3; 237 at 6; RC-00539-44.)

19         Most of this evidence falls short of the standard for adverse employment action under

20 Title VII.  Cecala's allegations of verbal abuse and work-place hostility do not, as a matter

21 of law, constitute retaliatory adverse employment actions.  *See Oncale v. Sundowner*

22 *Offshore Servs.*, 523 U.S. 75, 81 (1998) (Title VII does not establish a "general civility code"

23 for the American workplace).  Undeserved poor performance reports may state a claim for

24 retaliation, if tangible harm results. *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).

25 No such harm from bad reviews is shown here.  Cecala has offered no proof that she lost any

26 pay from the undeserved poor performance evaluations, or that NationsBank disseminated

27 them to other financial institutions.  (RC-00754.)  Significant denial of work opportunities

28 may state a claim for retaliation.  *See Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128

57

1   (2d Cir. 2004) (adverse employment action where employee endures "significantly

2   diminished material responsibilities"); *Strother v. So. Cal. Permanente Med. Group*, 79 F.3d

3   859, 569 (9th Cir. 1996) (noting that "mere ostracism in the workplace is not enough to show

4   an adverse employment action," but finding that total exclusion of employee who opposed

5   unlawful employment practices from everyday work activities presented a jury question).

6          Elliot opines that Newman breached the applicable standard of care in failing to assert

7   the retaliation claim in the underlying action. (PSOF Ex. 14 at 14; Ex. 16 at 5-6, 16.) Cecala

8   has made a prima facie case for retaliation, at least as to her contentions that the Bank "froze

9   Renee out of the workplace." (*Id.* at 18.) If this were the end of the analysis, Cecala's prima

10  facie showing would entitle her to trial on this malpractice claim.

11         However, this is not the end of the analysis. Any damage from the Bank's retaliatory

12  adverse employment action was short-lived. Cecala had "nothing to do" for only two weeks

13  before she voluntarily resigned in March 1997. Cecala's resignation is a supervening cause

14  that limits her damages to the two-week period of retaliation testified to by her. Therefore,

15  Cecala is entitled to little more than nominal damages on this omitted claim. *See* 5-39

16  *Larson on Employment Discrimination* § 93.09 (2d ed. 1999); *Katz v. Dole*, 708 F.2d 251,

17  253 (4th Cir. 1983) (Title VII claimants entitled to nominal damages).

18         **B.     Constructive Discharge**

19         Cecala also charges Newman with negligence for failing to assert that Cecala was

20  constructively discharged by NationsBank. (PSOF Ex. 14 at 14; Ex. 16 at 6-7.) Elliot opines

21  that Newman's failure to allege constructive discharge caused Cecala to lose the opportunity

22  to "seek damages for her termination" in the underlying action. (*Id.* Ex. 16 at 16) The

23  constructive discharge is founded on the same unjustified performance evaluations and forced

24  isolation underlying Cecala's retaliation claim. (*Id.* Ex. 16 at 16.) Employee resignation in

25  response to objectively unreasonable and intolerable retaliation on the part of the employer

26  is the functional equivalent of a formal discharge for remedial purposes. *Pa. State Police v.*

27  *Suders*, 542 U.S. 129, 141 (2004). "Whether a plaintiff quit or was constructively discharged

28  will determine whether he or she will be entitled to back pay and perhaps other remedies for

58

1   the period following termination of employment."   1-15 *Larson on Employment*
2   *Discrimination* § 15.08 (2d ed. 1999).  Thus, if Cecala were constructively discharged, her
3   retaliation damages would not necessarily have been cut off by her resignation in March 1997.
4    (PSOF Ex. 14 at 14.)

5          Whether Newman breached a legal duty in failing to assert claims for  retaliation and
6   constructive discharge, and whether Cecala would have prevailed if these arguments had been
7   presented, must be assessed under the law of the Court of Appeals for the Fourth Circuit as
8   of December 15, 1999, the deadline for filing post-hearing briefs with the NASD arbitrators.
9   (Doc. # 246 Ex. 4 at 383.)  "[T]he standard of care is not established by hindsight, but by the
10  skills, knowledge and diligence that were appropriate at the time of the alleged act or
11  omissions, not at the time of trial."  2 *Legal Malpractice* § 19:10 at 1230; *accord Smith v.*
12  *Lewis*, 13 Cal. 3d 356, 118 Cal. Rptr. 621, 625 (1975) ("[T]he crucial inquiry is whether [the
13  defendant-attorney's] advice was . . . legally deficient when it was given.  We must, therefore,
14  examine the indicia of the law which were readily available to defendant at the time he
15  performed the legal services in question.") (citations omitted).

16              **1.      Prima Facie Case for Constructive Discharge**

17          In his untimely affidavit, Elliot acknowledges that constructive discharge is more
18  difficult to prove than retaliation. (PSOF Ex. 16 at 16.) A prima facie case for retaliatory
19  constructive discharge requires "something more" than actionable retaliation.  *Suders*, 542
20  U.S. at 147; *Munday v. Waste Mgmt. of N. Am.*, 126 F.3d 239, 243 (4th Cir. 1997) (retaliatory
21  constructive discharge requires more than prima facie case of retaliatory adverse employment
22  action); *see Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) ("Where a
23  plaintiff fails to demonstrate the severe or pervasive harassment necessary to support a hostile
24  work environment claim, it will be impossible for her to meet the higher standard of
25  constructive discharge: conditions so intolerable that a reasonable person would leave the
26  job.").  A constructive discharge claimant in the Fourth Circuit in late 1999 was also required
27  to show that the employer "deliberately made his working conditions intolerable in an effort
28  to induce him to quit." *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1132 (4th Cir.

1   1995) (citation and internal quotations omitted); *Andrade v. Mayfair Mgmt.*, 88 F.3d 258, 262

2   (4th Cir. 1996) (same).    The Fourth Circuit articulated the "deliberateness" and

3   "intolerability" requirements as follows.

4            "Deliberateness," defined as the specific intent to force the employee to leave, could

5   be "shown by evidence that an employee's resignation was the reasonably foreseeable

6   consequence of the employer's conduct.    For example, intent may be inferred from a failure

7   to act in the face of known intolerable conditions." *Amirmokri*, 60 F.3d at 1132-33 (citation

8   omitted).    The Fourth Circuit subscribed to a minority view in requiring proof of

9   "deliberateness" as part of a prima facie case of constructive discharge. *Martin v. Cavalier

10  Hotel Corp*., 48 F.3d 1343, 1354 (4th Cir. 1995) (comparing Fourth Circuit precedent to that

11  of other federal circuits).    The Supreme Court overruled the deliberateness requirement in

12  2004, but the *Suders* decision is irrelevant to the issue of Newman's malpractice in 1998 and

13  1999.

14           The Fourth Circuit's definition of "intolerability" reflected the majority view adopted

15  by all federal circuits.    "Intolerability of working conditions . . . is assessed by the objective

16  standard of whether a 'reasonable person' in the employee's position would have felt

17  compelled to resign."    *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).

18  Constructive discharge cannot be triggered by the employee's subjective beliefs, no matter

19  how sincerely held.  *Id*. at 1255.  The constructive discharge doctrine protects an employee

20  "from a calculated effort to pressure him into resignation through the imposition of

21  unreasonably harsh conditions, in excess of those faced by his co-workers."   *Id*. at 1255.

22  Recognizing that "[e]very job has its frustrations, challenges and disappointments," the Fourth

23  Circuit, like all the courts of appeal, resisted attempts by claimants to transform the

24  "employment discrimination laws . . . into a palliative for every workplace grievance, real or

25  imagined, by the simple expedient of quitting."  *Id*. at 1255.  Thus, constructive discharge had

26  no bearing on "universal workaday frustrations," which employees were expected to work out

27  within the context of the employment relationship.  *Id*. at 1255-56; *see Bourque v. Powell

28  Elec. Mfg. Co.*, 617 F.2d 61, 66 (5th Cir. 1980).

## 2.    The Omitted Allegation of Constructive Discharge Is Not Economically Viable

Elliot's contention that Cecala would have recovered post-termination damages against NationsBank if Newman had alleged constructive discharge fails in light of these precedents. To prevail, Cecala would first have to surmount the Fourth Circuit's "deliberateness" requirement. The record shows that NationsBank executives affirmatively requested that Cecala *not* resign. (Doc. # 229 at 6 (citing Cecala's testimony regarding Bank supervisors' attempts to persuade her to stay on and resolve grievances internally).) It would have been difficult for Cecala to prove a specific intent to compel her to quit in the face of this direct evidence to the contrary. *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989) (Wilkinson, J., dissenting), *vacated in part*, 900 F.2d 27 (4th Cir. 1990) (en banc) (adopting panel dissenting opinion).

Even if Cecala could establish deliberateness, the working conditions described by her do not rise to the level of objective "intolerability." "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) (citations and internal quotations omitted). Furthermore, the court has located no authority from the Fourth Circuit or any other federal circuit, whether prior to or post-*Suders*, where the denial of work opportunities for a relatively short period of time was considered so intolerable as to compel a reasonable person to resign. *See Matvia v. Bald Head Island Mgmt.*, 259 F.3d 261, 273 (4th Cir. 2001) (Denying a claim for constructive discharge and noting that "co-worker ostracism [and] denial of management position . . . would not have compelled the reasonable person to resign. These incidents might have made the workplace less enjoyable for the reasonable person, but not intolerable."). *Coffman v. Tracker Marine L.P.*, 141 F.3d 1241 (8th Cir. 1998), is particularly instructive. The court held that the employee's ostracism and denial of work opportunities did not rise to the level of constructive discharge. There was no constructive discharge because the Title VII claimant was not totally precluded from seeking redress within the context of her existing employment. "Although

the proposed solution may not have been prompt and appropriate when viewed with the 20/20 lens of hindsight, [the employee ] had an obligation to not jump to the conclusion that the attempt would not work and that her only reasonable option was to quit.  Nor did she have the right to dictate how [the employer] would try to solve the problem."  *Id*. at 1247-48.

The two-week denial of work opportunities and undeserved negative evaluations of which Cecala primarily complains were not so intolerable as to lead a reasonable person to the conclusion that quitting was the only way out.  Newman cannot be liable for negligently failing to make an untenable argument for constructive discharge. *Niehoff*, 763 A.2d at 124.

### C.     Failure to Mitigate

Furthermore, even assuming that a claim for continuing lost pay was available under the doctrine of constructive discharge, post-termination damages would nevertheless be foreclosed as a matter of law because Cecala failed to mitigate.  It is no answer to say that the statutory duty to mitigate, 42 U.S.C. § 2000e-5(g)(1), does not apply because Newman never told Cecala about that duty.  Cecala did not ask, so Newman had no obligation to tell her to "be reasonably diligent in seeking and accepting new employment substantially equivalent to that from which [she] was discharged."  *Brady v. Thurston Motor Lines, Inc*., 753 F.2d 1269, 1273 (4th Cir. 1985); *Ford Motor Co. v. E.E.O.C.*, 458 U.S. 219, 231 (1982).  Cecala never told Newman anything about the Goldman Sachs mortgage finance position rejected by her shortly after her resignation from NationsBank.  (PSOF 2.)  Cecala testified to the lost opportunity to mitigate during the arbitration:

> [T]hey said yes, we [really] want you to join [Goldman Sachs]. . . . [but] they made the compensation offer at the level that I got paid previously . . . . [W]hen we had the discussion about compensation, I had such strong feelings of what happened to me at NationsBank.  I felt very taken advantage of.  I felt mistreated.  And I felt like if you did nothing else, [] at least compensate me fairly for what I contributed, and that didn't happen . . . . [Goldman Sachs was not] willing to make up the difference . . . [and] it was a further  punishment for me . . . . To this day, [Goldman Sachs has] invited me to work on whatever basis–they know I'm self-employed–[i]f I want to work on deals or what have you . . . . I'm not going to kid anybody–that was a huge possibility for me.  But I felt like after what had just happened, I wasn't going to go in with that understanding, that I was going to be paid below . . . what I was worth.  I just felt like I'd had enough.

(RC-00748-49, 00755.)

1    Whether an actual job offer was extended (Doc. # 224 Ex. 3) is of little moment where

2    Cecala's own testimony establishes that she would not have accepted the equivalent position

3    at Goldman Sachs without an increase in compensation.  A Title VII claimant "forfeits his

4    right to back pay if he refuses a job substantially equivalent to the one he was denied." *Brady*,

5    753 F.2d at 1273.  That is exactly what happened here.

**D.    Lost Opportunity to Recover Nominal Damages at a Net Loss to the Client
        Is Not Actionable Malpractice**

7

8    The court has located no authority for the proposition that an attorney may be liable

9    in negligence for failing to assert a theoretically viable claim that would cost far more to

10   prosecute than it would yield.

11   *Niehoff* conditions "failure to plead" malpractice liability upon a lost opportunity to

12   achieve a "favorable" result.  763 A.2d at 124.  The Maine Supreme Court did not define the

13   term "favorable," but it must be more than Pyrrhic victory.  Negligence-based malpractice

14   liability inures only if, in addition to establishing duty and breach of that duty by failing to

15   assert a viable claim, the plaintiff-client demonstrates that the defendant-attorney's omission

16   caused her to sustain *economic* damages.  *Reed*, 183 Ariz. at 318, 903 P.2d at 626.  The loss

17   of an opportunity to assert an economically futile claim falls short of the damages required

18   by settled legal malpractice doctrine.  "[I]f there is no injury, there is no tort." *McKnight*, 270

19   F.3d at 519; *Schweizer*, 93 F. Supp. 2d at 395-96 (damages from malpractice must be readily

20   measurable in economic terms).

21   As it turns out, in the current posture of this malpractice litigation, the omitted claim

22   for retaliation is uneconomic.   It would be improper to put Newman into the Bank's shoes

23   without reason to believe that Cecala sustained meaningful economic injury from Newman's

24   failure to plead a retaliation claim.  As the Supreme Court noted in a different context, "it

25   follows from . . . settled principles [of Rule 56(c), Fed. R. Civ. P.] that if the factual context

26   renders respondents' claim implausible–if the claim is one that simply makes no economic

27   sense–respondents must come forward with more persuasive evidence to support their claim

28   than would otherwise be necessary." *Matsushita*, 475 U.S. at 587.

1    It is one of the services of lawyers to clients to counsel them against litigation without

2  practical benefit to the client, even if the litigation has theoretical merit.  A lawyer who led

3  a client into major legal fee expenditures without prospect of net benefit to the client would

4  be subject to ethical censure for doing so.  Adding a retaliation claim would have been proper

5  and strategically justified at the outset.  But with the loss of the economically viable claims–in

6  the arbitration and now in this malpractice litigation–Newman is left to be judged by his

7  duties concerning non-economic claims.  Omitting a claim for which the recovery could not

8  match the expense of litigation cannot be negligence–nor could there be any net damage from

9  it.

10    IT IS THEREFORE ORDERED that Defendants' Motion to Strike Cecala Declaration

11  and Elliot Supplemental Affidavit (Doc. # 227) is treated as an objection to admission and is

12  granted in part and denied in part.  The Elliot Supplemental Affidavit is excluded, and the

13  Cecala Declaration is not excluded.

14    IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment (Doc.

15  # 171) is granted.  The court will delay ordering entry of judgment until conclusion of the

16  previously ordered settlement conference (Doc. # 250).

17    DATED this 2nd day of May 2007.

18

19  _____

20  Neil V. Wake
    United States District Judge

21

22

23

24

25

26

27

28

64